Albert LOPEZ, Shirley Lopez,
husband and wife,

v.

JOHNS MANVILLE, Amatex, Unarco,
Raymark Industries, Fibreboard Corpo-
ration, Pittsburgh Corning, Owens Illi-
nois, Owens Corning Fiberglas, Celotex,
Keene Corporation

v.

USA.

No. C84 155M.

United States District Court,
W.D. Washington.

May 19, 1986.

Truman R. Castle, Seattle, Wash., for plaintiffs.

Richard Hilfer, Bangs, Castle, Schnautz & Hilfer, P.S., Carney, Stephenson, Badley,

Smith, Mueller & Spillman, Eileen Concannon, Garvey, Schubert, Adams & Barer, Patrick Sheldon, Karr, Tuttle, Koch, Campbell, Mawer & Morrow & Sax, Paul Gibbs, Williams, Lanza & Gibbs, Jon Hunt, Stafford, Frey & Mertel, James Murphy, Michael McKay, McKay & Gaitan, Charles Moren, Moren Lageschulte & Cornell, Seattle, Wash., Richard Feldman, Rivkin, Leff, Sherman & Radler, Garden City, N.Y., for defendants.

H. Michael Semler, JoAnn Bordeaux, Torts Div., U.S. Dept. of Justice, Washington, D.C., Chris Pickrell, Asst. U.S. Atty., Seattle, Wash., for U.S.

## ORDER GRANTING MOTION OF UNITED STATES FOR DISMISSAL

McGOVERN, Chief Judge.

### INTRODUCTION

The United States moves to dismiss the third-party claims of Raymark Industries, Inc. and Eagle-Picher Industries, Inc. or for summary judgment. This case, and eighteen others in which the United States is a third-party defendant, arises out of asbestos exposure at Puget Sound Naval Shipyard (PSNS); both manufacturers who have brought third-party claims in Washington are involved in this case, and all major legal issues are raised.

Plaintiff Albert Lopez, was a civilian pipefitter, pipecoverer, and insulator at PSNS from 1947 to 1984 and was covered by the provisions of the Federal Employees Compensation Act (FECA) 5 U.S.C. § 8101–8193. Plaintiff has received FECA benefits, but following Plaintiffs' settlements with manufacturers, the United States has recovered from him (after his deduction of costs, reasonable attorney fees, and an amount equal to 20% of the remainder) all sums it paid pursuant to FECA, as required by 5 U.S.C. § 8132.[1] Plaintiff will

---

**1.** The purposes for this requirement of reimbursement are (1) to prevent an employee from recovering twice for the same injury and (2) to keep the fund solvent and to minimize the cost of the program. *Lorenzetti v. United States,* 710 F.2d 982 (3rd Cir.1983). Moreover, the Supreme Court, ruling unanimously in *Lorenzetti* on appeal, held that the plain meaning of the

become eligible for additional FECA payments should his medical expenses ever exceed the amount recovered from the manufacturers.

Plaintiffs filed suit against approximately 20 manufacturers and suppliers of asbestos-containing products. The complaint was settled as to all manufacturers except those in bankruptcy. Meanwhile, the third-party complaints were filed. Other manufacturers dismissed their third-party claims, but Raymark and Eagle-Picher seek to recover the respective settlement amounts of $7,200 and $10,000, plus associated fees and costs. The manufacturers assert claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671–2680; the Tucker Act (contract claims), 28 U.S.C. §§ 1346(a)(2), 1402; and in admiralty.

## DISCUSSION

### A. Federal Tort Claims Act

The United States has waived sovereign immunity respecting tort claims in the Federal Tort Claims Act (FTCA) at 28 U.S.C. § 2674:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances,....

This waiver extends to third-party claims against the Government. *United States v. Yellow Cab Co.*, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951).

The FTCA confers the federal courts with exclusive jurisdiction over

> civil actions on claims against the United States ... for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person,

would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Another statute is relevant to consider in this case. A provision of the Federal Employees' Compensation Act (FECA) limits the Government's liability to employees who have received compensation under the act. 5 U.S.C. § 8116(c). This section provides in pertinent part as follows:

> (c) The liability of the United States or an instrumentality thereof under this subchapter [5 USCS §§ 8101–8193] or any extension thereof with respect to the injury or death of an employee is exclusive and instead of all other liability of the United States or the instrumentality to the employee, his legal representative, spouse, dependents, next of kin, and any other person otherwise entitled to recover damages from the United States or the instrumentality because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or by an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statute....

Thus, in return for paying benefits to injured Government employees regardless of fault, the Government is immunized from further tort liability.

### 1. Effect of FECA on Third-Party Indemnity/Contribution Claims

■ Eagle-Picher and Raymark argue that *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983) further extends the FICA waiver of sovereign immunity from tort liability to third-party claims arising out of injuries to federal employees covered by FECA.

The Government contends that *Lockheed* does not so extend the FTCA waiver of immunity, did not confer an indemnity/contribution action upon third parties,

---

statute entitles the United States to reimbursement under § 8132 regardless of whether the award or settlement in satisfaction of the third-party liability is for losses other than medical expenses or lost wages. *United States v. Lorenzetti*, 467 U.S. 167, 104 S.Ct. 2284, 81 L.Ed.2d 134 (1984).

and that although the FECA may not directly bar such suits, the Supreme Court recognized the possibility that the underlying substantive law might. The Court in *Lockheed* stated in its holding:

> The District Court held that Lockheed had a right to indemnity under the governing substantive law, but the Court of Appeals did not rule on that question. Accordingly, we do not consider it. We adhere to the decision in *Weyerhaeuser*, and hold only that FECA's exclusive-liability provision, 5 U.S.C. § 8116(c), does not directly bar a third-party indemnity action against the United States.

*Id.* at 199, 103 S.Ct. at 1039. The Court reasoned that FECA's exclusive-liability provision, 5 U.S.C. § 8116(c), governs only the rights of employees, their relatives, and people claiming through or on behalf of them—these being the only parties benefiting from the *quid pro quo* compromise of FECA—and that Congress has not modified this provision to include third parties. *Id.* at 193–199, 103 S.Ct. at 1036–39.

The dissenting opinion in *Lockheed* is of interest here because the ideas elucidated therein echo important concerns at the heart of the issues at bar. In his dissent, Justice Rehnquist distinguished earlier cases relied on by the majority where the balance struck between competing policies favored rights to recovery based on "the special relationship between the third party and the employer created by ancient maritime law or by voluntary agreement." *Id.* at 201, 103 S.Ct. at 1040. The only relationship that Lockheed could claim, however, continued Justice Rehnquist, was one based on the Government's breach of duty of care owed its employee. Thus, Lockheed's case involves an indirect sharing of responsibility among wrongdoers rather than a breach of direct duty owed Lockheed. *Id.* at 202, 103 S.Ct. at 1040–41. Therefore, concluded Justice Rehnquist,

> For these reasons, I am convinced that we should retain the balance our earlier

decisions would require. Where a third party has a direct action against the Government that fits into the same category as the claims we have allowed in the past, it may include a claim for damages it has paid to a Government employee. But where the third party's claim is an indirect action based on contribution or indemnity, Congress' clear intent to limit the liability of the United States should prevail.

*Id.* at 203, 103 S.Ct. at 1041.

Justice Rehnquist reached his conclusion by taking a broader, policy oriented perspective, and would find FECA's limitation provision waived for third-party suits only where there existed a special relationship creating direct duties. Although Eagle-Picher and Raymark assert that the Government breached independent duties owed them, this claim need not be addressed here in view of *Lockheed's* majority holding. For now, *Lockheed* will permit a third-party suit for contribution, FECA provisions creating no bar. There remains the question of whether the governing substantive law provides Eagle-Picher and Raymark with a right to indemnity.

### 2. *Washington Law Applies*

#### a. *The Joint Tortfeasor Requirement*

The FTCA requires that the court apply the law of the state "where the act or omission occurred." 28 U.S.C. § 1346(b). There is no dispute that the tortious conduct complained of occurred in Washington state.

The manufacturers apply Washington law up to a point. Eagle-Picher argues that under Washington's choice-of-law principles, the Court must consider its claim against the United States as *vessel owner* pursuant to the federal jurisprudence of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b).[2] Under the circumstances of this case, the argument continues, Washington state courts would have to look to the

---

**2.** "Longshoremen" changed to "Longshore" by Amendments of 1984, Pub.L. No. 98–426, § 27(d).

federal statute to determine the liability of a private person, thus, this court must look to that law in adjudging the conduct of the Government. *See, Lambertson v. United States,* 528 F.2d 441, 444 (2d Cir.), *cert. denied,* 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976).

Raymark comes to the same conclusion arguing that although a private *employer* is immune from suit by its employees and third-parties claiming noncontractual indemnity or contribution, RCW 51.04.010, *Glass v. Stahl Specialties Co.,* 97 Wash.2d 880, 652 P.2d 948 (1982), Title 51 does not reach activity covered by maritime remedies. RCW 51.12.100. The applicable maritime remedy is the LHWCA which sanctions third-party lawsuits against the United States in its capacity as *vessel owner.* 33 U.S.C. §§ 905(b), 902(21); *Lockheed,* 460 U.S. 190, 103 S.Ct. 1033; *In re All Asbestos Cases,* 603 F.Supp. 599 (D.Hawaii 1984).

Summarized, the manufacturers' argument, characterizing the Government's activities as maritime, applies only Washington's choice-of-law principles, then argues that LHWCA federal jurisprudence allows third-party lawsuits against compensation paying employers who are also vessel owners (a "dual capacity" theory).

The Government argues, first, that the 1981 Tort Reform Act abolished indemnity, *inter alia,* where trial on the underlying claims had not taken place by July 26, 1981. RCW 4.22.040(3) and 920(2). The manufacturers counter that only indemnity between active and passive tortfeasors was abolished, and that nothing in the statute extinguished other circumstances under Washington law where indemnity is allowed: where an express contract so provides or there existed (and was breached) an independent duty between the putative indemnitor and indemnitee.

■ While the manufacturers appear to imply two bases for allowing indemnity, *Glass v. Stahl,* 97 Wash.2d 880, 652 P.2d 948 (1982), however, speaks of the need for express, written agreements before an employer may be deprived of the immunity provided by Washington's Industrial Insurance Act:

This court has recognized, however, that a third party claim against the employer can be maintained if the employer "voluntarily assumes an independent duty or obligation to the third party." Generally, Washington courts have required that a written indemnification agreement between the employer and the tortfeasor exist before such an independent duty or obligation could be found. Such agreements purporting to deprive an employer of the immunity provided by the Industrial Insurance Act are disfavored under Washington law, and any intent to provide for indemnification must be clearly expressed in the agreement.

*Id.* at 885–86, 652 P.2d at 951. (Citations omitted.) Therefore, there being no cause of action for indemnity between active and passive tortfeasors, RCW 4.22.040(3), nor a written indemnification agreement, nor other clear indication that the parties intended to provide for indemnification, the manufacturers' cause of action for indemnity is dismissed.

■ Second, the Government argues that although the 1981 Tort Reform Act created a right of contribution in those cases not tried by July 26, 1981, contribution runs only against *joint tortfeasors,* *i.e.,* persons "who are jointly and severally liable upon the same indivisible claim for the same injury, death or harm." RCW 4.22.040(1); *Glass,* 97 Wash.2d at 883, 652 P.2d at 950. The Government argues that it has no tort exposure or liability to the Plaintiff because the FECA guarantees compensation for workplace injuries regardless of fault in return for workers giving up their right to sue. Since employees have no right to sue in tort, the Government has no tort liability and cannot be a joint tortfeasor. Also, continues the Government's argument, viewing the United States as a private employer, as the FTCA requires, a private employer in Washington is covered by the State's Industrial Insurance Act. RCW Title 51.

The Act's exclusive remedy provision, RCW 51.04.010, abolished all employee actions against employers for workplace injuries, and the jurisprudence construing that provision precludes "dual capacity" suits and parallel third-party claims for contribution.

Pursuant to the requirements of the FTCA, and there being no doubt that the underlying alleged tortious conduct occurred in Washington, the manufacturers' claims for contribution must be viewed in accordance with Washington law concerning contribution. The question is whether under the circumstances of this case, Raymark and Eagle-Picher have a claim for contribution under Washington law. The 1981 Tort Reform Act provides that in those cases not tried before July 26, 1981, contribution runs against persons "who are jointly and severally liable upon the same indivisible claim, for the same injury, death or harm." RCW 4.22.040(1). The question then becomes whether, pursuant to RCW 4.22.040(1), the Government is jointly and severally liable for Plaintiff Lopez's injury. The FECA, by virtue of its paying employees immediate, fixed benefits, regardless of fault, without the need for litigation, but in return for the employee giving up the right to sue, precludes the Government from being a joint tortfeasor. This conclusion is mandated by the logic of long-standing Ninth Circuit opinion holding that because of the FECA exclusive remedy provision, the United States cannot be a joint tortfeasor for the purposes of third-party recovery where federal employees are involved. In *United Air Lines v. Wiener*, 335 F.2d 379 (9th Cir.), *cert. dismissed sub nom. United Air Lines v. United States*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964), the Court concluded, first, as did the Supreme Court later in *Lockheed*, that the FECA did not itself bar recovery by a third party, and, second, that under applicable state law, indemnity was available only against joint tortfeasors; owing to the exclusive liability provision of FECA, the United States had no tort liability to the deceased federal employees or their survivors. "There being no underlying liability on the part of the government, United's claim for indemnity must fail." *Id.* at 404. This conclusion was later reaffirmed in *Wien Alaska Airlines v. United States*, 375 F.2d 736 (9th Cir.), *cert. denied*, 389 U.S. 940, 88 S.Ct. 288, 19 L.Ed.2d 291 (1967). Still later, the Ninth Circuit found no justification for reconsidering *Wiener. Adams v. General Dynamics Corp.*, 535 F.2d 489 (9th Cir.1976).

Thus, under the analysis provided in the foregoing cases, the manufacturers do not have a claim for contribution under Washington law because the FECA exclusive liability provision precludes the United States from being a joint tortfeasor for purposes of third-party recovery.

### b. *The Analogous Private Person*

■ Even if the foregoing Ninth Circuit opinions could be avoided and the United States considered a joint tortfeasor, the next step would be to view the United States as a private individual under like circumstances, pursuant to 28 U.S.C. § 1346(b), and the same result would obtain. On the issue of whether the circumstances are such that the Government, if a private person, would be liable in accordance with Washington state law, the Government argues that the analogous private individual is a Washington employer covered by the Washington Industrial Insurance Act, while the Defendant manufacturers argue that the analogous private party is a private shipyard/vessel-owner employer in Washington covered by the LHWCA.

To determine whether the circumstances are such that the United States as a private person would be liable to the manufacturers, it is logical to focus on the most significant elements of the circumstances. Significant elements obviously are elements material to the issue of liability. Immunization from tort liability pursuant to an arrangement where the employer pays benefits regardless of fault is as significant as the allegations of breach of duty. The analogous private person, then, is a Washington employer covered by the Industrial Insurance Act, RCW Chapter 51.04–51.98,

because that Act contains an exclusive liability provision similar to that of the FECA.

The Government and the manufacturers are in agreement on the effects of the Industrial Insurance Act on a covered employer. A Washington employer covered by the Industrial Insurance Act has the benefit of the Act's exclusive remedy provision, RCW 51.04.010, which abolishes all employees' actions against employers for work place injuries. Washington case law construing the exclusive remedy provision of the Washington Industrial Insurance Act has concluded that this provision, "of the broadest, most encompassing nature," *West v. Zeibell*, 87 Wash.2d 198, 201, 550 P.2d 522, 524 (1976), precludes dual capacity suits, *Thompson v. Lewis County*, 92 Wash.2d 204, 206, 595 P.2d 541, 542–44 (1979), and parallel third-party claims for contribution: "Where there is no liability, there can be no joint and several liability. Where there is no joint and several liability, there is no right of contribution." *Glass*, 97 Wash.2d at 886–87, 652 P.2d at 952. Therefore, under Washington law, a private person in circumstances similar to the Government, would not be liable to third parties claiming contribution, owing to the similar operation of the Washington Industrial Insurance Act to the FECA.

To consider the Government as a private employer covered by the LHWCA would be to ignore the FECA as a significant aspect of the Government's circumstances. While Section 905(a) of the LHWCA provides exclusive liability to the employer, Section 905(b) preserves an action against the vessel, *i.e.*, against the ship owner, notwithstanding that the employer and ship owner may be the same.[3] *See, Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Thus, the Government was seen having a dual capacity of employer and ship owner, being immune in the former, but subject to traditional tort liability in the latter capacity until the law was changed. Clearly, an employer subject to the LHWCA before amendment does not abide in circumstances similar to the United States subject to the FTCA and the FECA.

There are other impediments to analyzing the Government's liability in these circumstances under the LHWCA. The LHWCA expressly excepts from coverage employees of the United States or any of its agencies. 33 U.S.C. § 903(a)(2) (now 33 U.S.C. § 903(b) by amendment of September 24, 1984). Plaintiff Lopez would be an excepted employee. The manufacturers' argument requires the application, through Washington's choice-of-law rules, of federal jurisprudence construing the LHWCA. The LHWCA must apply, according to the argument, because the Washington Industrial Insurance Act does not cover those aspects of shipyard activity covered by maritime remedies. RCW 51.12.100. The United States would thus be subject to liability for harm to one of its employees, Plaintiff Albert Lopez, pursuant to a statute from which employees like Lopez were excluded. This result cannot have been within the contemplation of Congress.

Another problem centers on the necessary maritime nature of claims properly within the LHWCA's ambit. The First Circuit has reviewed the relevant history of the LHWCA, *Drake v. Raymark Industries, Inc.*, 772 F.2d 1007, 1012–1014 (1st Cir.1985), and has concluded that "§ 905(b) implicitly requires that a tort be consummated within the admiralty jurisdiction to be cognizable under the statute." No argument has been advanced to persuade a contrary conclusion. The underlying tort sued upon by Plaintiffs Lopez is a product liability action under Washington law. This District Court concluded in *Franklin v. Johns-Manville*, Civil Cause No. C81–533M (Order Denying Plaintiff's Motion to Amend Complaint, June 10, 1982) that there was no maritime nexus rendering the tort allegations cognizable in admiralty. The First Circuit concluded similarly in

---

**3.** Amendment to Section 905(b) of September 28, 1984 barred suits by private shipyard employees covered by LHWCA against the employer as ship owner. Sections 5(a)(1) and 28(c), Pub.L. 98–426, 98th Cong., 2d Sess.

*Austin v. Unarco Industries, Inc.,* 705 F.2d 1 (1st Cir.), *cert. dismissed,* 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983), as have all other circuits since then, including the Ninth, that have considered the question of the nexus to maritime activity of asbestos injury sustained by shipyard workers. *See, Drake* at 1015, and *e.g., Owens-Illinois, Inc. v. United States District Court,* 698 F.2d 967 (9th Cir.1983). Because Plaintiffs could not have brought the underlying cause of action in admiralty, it follows, perforce, that the manufacturers could not bring a derivative contribution/indemnity action.

### c. *Independent Duties*

■ In addition to the contribution/indemnity claims, which are essentially derivative of the Plaintiffs' cause of action, the manufacturers also contend that the Government owed noncontractual, independent duties of care directly to the manufacturers. These direct duties of care derive from the special, unique relationship between the Government and the manufacturers. This "special relationship" derives from the manufacturers and the Government working together in "a very real, if not legally cognizable, partnership—in the development, design, manufacture, sale and procurement of asbestos-containing insulation products for use at federal and government-contract shipyards throughout the country." (Eagle-Picher memorandum in response at p. 26.) The duties of care arising from this "special relationship" are said to include duties (1) not to require the production of unsafe products, (2) to share with the manufacturers the extensive knowledge the United States alone possessed regarding occupational exposure to asbestos dust, and (3) to use the manufacturers' products in the manner for which they were intended and in a reasonably safe and prudent way. (*Id.* at 27–28.)

A similar argument was made by the manufacturers in *Drake.* The defendants argued that the putative indemnitor owed a duty, independent of that owed its employees, not to use asbestos materials in a way that would make them unreasonably dangerous to the employees or others. Whether the duty was based on tort or contract or on an express or implied contract was not alleged. In dismissing the claim for failure to state a cause of action upon which relief could be granted, the *Drake* court relied on the language of Judge Friendly in *Zapico v Bucyrus-Erie Co.,* 579 F.2d 714 (2nd Cir.1978). Judge Friendly, summarizing, said the Defendant was

asking us to hold a user liable to a manufacturer for the former's negligent use of the latter's defective product. This we decline to do. Cf. 2A Larson [Workmen's Compensation Law], *supra,* at 402 [ (1976) ] ("But when a purchaser buys a product, does he make an implied contract with the manufacturer to use the goods in such a way as not to bring liability upon the manufacturer? This would be stretching the concept of contract out of all relation to reality").

*Id.* at 723.

In urging that noncontractual indemnity is available in the case at bar, Eagle-Picher is stretching legal concepts beyond their rational borders. To hold the Government liable to Raymark and Eagle-Picher for the Government's alleged negligent use of these manufacturers' alleged defective products is a convoluted attempt to reshuffle liability. This attempt carries with it no logic or justice.

The "special relationship" underpinning to this argument must fail. This "special relationship" harkens back to the Government contract specifications defense where the manufacturers of asbestos containing products contended, *inter alia,* that the Government had extensive knowledge of asbestos hazards and exercised control over the design process. The validity of this defense was disposed of in the Court's "Order on Cross Motions for Summary Judgment" in *Tefft v. A.C. & S., et al.,* C84–154M, October 11, 1984. In that case, and two others decided at the same time (*Raines,* C84–165M and *Marry Rose,* C84–168M), the manufacturers asserted the Government contract specification defense. The Court concluded:

... that because the manufacturers had significant influence over the development of specifications, and because certain specifications were performance specifications which leave the details of manufacture to the manufacturer, the Defendants PCC, Fibreboard, and Raymark have failed to meet their burden on the element concerning who established the specifications. This element being dispositive of the defense, the Court need not address the remaining elements. Accordingly, summary judgment must be granted in favor of the Plaintiffs and denied as to the defendants.

Eagle-Picher did not assert the Government contract specifications defense in these cases, but in this case, it draws conclusions about the United States' domination of the design and manufacturing process in a self-serving way in a few paragraphs.

This argument for indemnity is also related to the earlier analysis under part 2.a. concerning Washington's abolition of indemnity. (Page 153, *supra*.) Neither Raymark nor Eagle-Picher has demonstrated persuasively that the United States as a consumer of their products owed them a duty such that the United States should indemnify the manufacturers in the amount of their damage settlements with Plaintiffs. Having reached this conclusion, it is unnecessary to reach the issue of whether under Washington law the manufacturers' right of contribution was waived by the settlements.

## B. The Tucker Act (Contract Claims)

In addition to their FTCA based indemnity/contribution claims, Eagle-Picher and Raymark seek contractual indemnity from the United States pursuant to the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1402,[4] which confers jurisdiction on the district courts and Court of Claims for claims, not exceeding $10,000, against the United States, based on express or implied contract.

Eagle-Picher bases its claim on both written contracts for the Government's procurement of asbestos-containing products from Eagle-Picher and implied-in-fact contracts arising from the conduct of Eagle-Picher and the Government in the development, production, and distribution of asbestos-containing products. The breached duties under these contracts arise from the necessary conformance with the Government's mandatory specifications. By contractual enforcement of these mandatory specifications, the Government implied that it warranted them for their safety, among other things. Additionally, Eagle-Picher argues that the Government implicitly warranted that it would exercise due care in designating, specifying, and using Eagle-Picher's asbestos-containing insulation products.

Raymark, like Eagle-Picher similarly contends (1) that the Government made implied warranties that it would use due care in designing, specifying, and overseeing the use of asbestos products at Puget Sound Naval Shipyard, and (2) that the Government implicitly warranted its mandatory specifications for their accuracy, feasibility, and safety.

The Government contends that the manufacturers are not entitled to contractual indemnity under the Tucker Act because the Anti-Deficiency Act, 31 U.S.C. § 1341, prohibits Government employees from committing the United States to a "contract or obligation for the payment of money before an appropriation is made, unless authorized by law." 31 U.S.C. § 1341(a)(1)(B). Since express indemnification agreements are prohibited, implied agreements must also be prohibited, and since there has been no Congressional appropriation for the agreements alleged, and since one who deals with an agent of the Government is charged with knowing the limits of the

---

**4.** Act of March 3, 1887, ch. 359, 24 Stat. 505 (codified in scattered sections of 28 U.S.C.). The Act is named for its principal author and promoter. John Randolph Tucker of the House Committee on the Judiciary. Orme, *Tucker Act Jurisdiction over Bench of Trust Claims*, B.Y.U.L. Rev. 855 (1979).

agent's authority, the claims based on an implied contractual duty or agreement to indemnify must be dismissed.

Alternatively, the Government argues that even if the manufacturers' claims were not barred by the Anti-Deficiency Act, Tucker Act claims are limited to express or implied-in-fact contracts, not those implied-in-law.

### 1. The Antideficiency Act

■ Because the Antideficiency Act is dispositive when applied to the Tucker Act claims herein, its provisions should be considered first. The Antideficiency Act, 31 U.S.C. § 1341, provides in pertinent part as follows:

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—

(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or

(B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

31 U.S.C. § 1341(a)(1). The obvious purpose of the statute is to prohibit anyone from obligating the Government in excess of the dollars appropriated by Congress. *Solar Turbines International v. United States*, 3 Cl.Ct. 489 (1983).

An Agreement by the Government to indemnify a product seller for future tort liability that the seller may incur as a result of a government employee's use of the product would create a future obligation of unknown magnitude. While the amount of money needed to purchase the product could be readily computed and appropriated, the amount needed to cover such a contingency as future tort liability would be unknown. Without extra money being appropriated to cover the contingency, it would constitute a deficiency which would violate the Antideficiency Act. In *In re All Asbestos Cases*, the Court noted that

The Comptroller General consistently has taken the position that a government agent may not make any oral or written agreements to indemnify or "hold harmless" a contractor for future losses under a contract, absent specific authorization or appropriation. 35 Comp.Gen. 85 (1955); 33 Comp.Gen. 90 (1935); *see also, California-Pacific Utilities Co. v. United States*, 194 Ct.Cl. 703 (1971).

603 F.Supp. at 611. Exemplifying this conclusion in a thorough analysis is *Matter of Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp.Gen. 361 (1983) (attached as Exhibit G to the Government's opening memorandum herein). There, the Comptroller General affirmed his earlier decision that a clause (desired by the Public Contract Law Section of the American Bar Association for use in cost reimbursement contracts) entitled, "Insurance-Liability to Third Persons," violates the Antideficiency Act. The Comptroller General took the view that the maximum amount of obligation could not be determined at the time a contract was signed and noted that the General Accounting Office (GAO) suggested that "no open-ended indemnities be promised without statutory authority to contract in advance of appropriations." *Id.* This Comptroller General opinion goes on to distinguish the rare situations where indemnification agreements were granted. None of those unique situations applies to this case involving ordinary procurement contracts. The cases demonstrating this unbroken pattern stretch back beyond the time when the Comptroller General's Office existed. In 15 Comp.Dec. 405 (1909), the Secretary of the Treasury (the Comptroller General's predecessor) said:

Under the [Antideficiency Act], no officer of the Government has a right to make a contract on its behalf involving the payment of an indefinite and uncertain sum, that may exceed the appropriation and which is not capable of definite ascertainment by the terms of the contract, but is wholly dependent upon the happening of some contingency, the consequences of which cannot be defined by the contract.

*Id.* at 6. (See Government's Exhibit G.)

Raymark argues that 3 U.S.C. § 1304(a) contradicts the Government's position con-

cerning the Antideficiency Act. This argument is without merit. "... [T]he effect of § 1304(a) is simply that the Anti-Deficiency Act does not bar payment of valid judgments against the United States. Thus, § 1304(a) is irrelevant to the issue of whether, in these cases, the legal predicate for judgment against the government exists." *In re All Asbestos Cases,* 603 F.Supp. at 612, n. 16.

The manufacturers have cited no cases that demonstrate with persuasive authority that the Antideficiency Act does not prohibit the Government from implicitly agreeing to indemnify manufacturers with whom it contracts for the manufacturers' liability versus a third party who used the product sold to the Government. In *Terteling v. United States,* 334 F.2d 250, 255, 167 Ct.Cl. 331 (1964), cited by the manufacturers, the United States contracted to furnish gravel pits *without cost* to the contractor. When the contractor had to defend itself in lawsuits brought by landowners of certain lands from which gravel had been taken, the Court read the "without cost" provision to be unrestricted and to not prohibit reimbursement of litigation costs. These facts are unique and not at all applicable to the Government's relationship with these manufacturers. Moreover, the case involved the meaning of a term of the written contract between the parties.

Because the Antideficiency Act is a bar to the manufacturers' claims of an implied contract to indemnify, those claims, brought pursuant to Tucker Act jurisdiction, are dismissed.

### 2. *Claims Actionable Under the Tucker Act*

■ Even if the Antideficiency Act were no bar to the manufacturers' contract based claims, further analysis of these asserted implied agreements to indemnify reveals yet another ground for their dismissal.

It is well-settled that Tucker Act jurisdiction extends only to claims arising out of express or implied-in-fact contracts, and that it does not reach contracts implied in law. *In re All Maine Asbestos Litigation,* 581 F.Supp. 963, 972 (D.Maine 1984). *In re All Asbestos Cases,* 603 F.Supp. 599, 610 (D.Hawaii 1984), each citing *Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925), and *Hatzlack Supply Co. v. United States,* 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980).

The distinction between a contract implied in fact, over which there is Tucker Act jurisdiction, and a contract implied in law, over which there is no Tucker Act juridiction, is well established. An implied-in-fact contract contains all the necessary elements of a binding agreement, but, since its express terms have not been reduced to writing or stated orally, its provisions must be inferred from the intent and course of conduct of the parties. *See* Restatement (Second) of Contracts §§ 4, 19 (1981); 1 A. Corbin, *Corbin on Contracts* § 19 (1963). An implied-in-law contract, a so-called quasi-contract, is not a contract at all, but a legal fiction which enables a court to fashion an equitable remedy to prevent the unjust enrichment of one party at the expense of another.

581 F.Supp. at 972.

In *In re General Dynamics Asbestos Cases,* 539 F.Supp. 1106, 1109–12 (D.Conn. 1982), the Court analyzed both whether there was an implied obligation as a matter of law or one as a matter of fact, *i.e.,* one arising from the purchaser's affirmative conduct. As to whether an obligation arose as a matter of law, the Court quoted *Santisteven v. Dow Chemical Co.,* 506 F.2d 1216 (9th Cir.1974) where the plaintiff sued Dow on negligence and strict liability theories for injuries sustained while using an industrial caustic soda. Dow impleaded plaintiff's employer Kennecott Copper Corp. (KCC) alleging its failure to properly instruct its employer and to provide a safe work environment. Finding no express obligation by KCC to Dow, the Court found no other basis to find that KCC owed an independent duty to Dow:

Dow's liability arises because of a breach of a duty it owes to users of its prod-

ucts—in this instance, a worker. Assumably, Kennecott has also breached a duty owed to the same worker by its negligence. Under Dow's theory, the whole burden of loss would be shifted whenever the employer was negligent in any way because the employer would have failed in its duty to extricate the third party from possible liability. Yet indemnity does not work in that way.

*Id.* at 1110.

Concluding that no implied obligation arose as a matter of law, the Court turned to the question of whether one could be fairly and reasonably inferred from affirmative conduct of the purchaser, other than the mere purchase of the product. The Court concluded that the purchase orders' references to Government-promulgated specifications—an argument similar to that made at bar—were not sufficient to imply a contractual obligation to indemnify the third-party plaintiffs. The Court said it could not logically be contended

> that the requirements of the military specifications referred to in Electric Boat's purchase orders created in any way a risk to the plaintiffs which was not inherent in the ordinary and voluntary marketing of asbestos products.
>
> \*    \*    \*    \*    \*    \*

To accept arguments of the third-party plaintiffs, for which no authority of relevance is cited, would truly turn "indemnity on its head," *Santisteven v. Dow Chemical Co.*, 506 F.2d [1216] at 1219 [9th Cir.1974], since the representation that a product is safe for its intended use normally flows from the manufacturer to the purchaser, not vice versa.

*Id.* at 1112.

In support of their position that, in effect, the specifications themselves create a basis for liability, the manufacturers cite *Ordnance Research, Inc. v. United States*, 609 F.2d 462, 221 Ct.Cl. 641 (1979) and *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). The Government correctly argues that these cases are distinguishable in that damages or equitable contractual adjustments were awarded because government specifications or delays or other mistakes increased the cost of actual performance, and in such cases there is assumed to be governmental intention and commitment to pay for performance to complete the contract. These cases did not involve indemnification for tort judgments or settlements incurred by the contractors. Such liability is manifestly collateral to contractual performance. In *In re All Maine Asbestos Litigation*, 581 F.Supp. 963 (D.Maine 1984), the court concluded that "without any evidence of consent, this Court cannot find a contract implied in fact," *id.* at 973, and that the sale of the asbestos products to the Government pursuant to specifications provided no basis for finding an implied warranty such that indemnification by the Government was necessary:

> It is well established that a vendor/vendee relationship creates no implied agreement by the buyer to indemnify the seller for injuries resulting from the use of the purchased product. *In re General Dynamics Asbestos Products* 539 F.Supp. 1106, 1110–12 (D.Conn.1982); *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 723 (2d Cir.1978); *White v. Johns-Manville Corp.*, 662 F.2d 243, 248 (4th Cir.1981).

*Id.* at 981.

Other courts have drawn similar conclusions concerning the asserted, implied "reverse warranty." In *White v. Johns-Manville Corp.*, 662 F.2d 243 (4th Cir.1981), the Court said:

> This "reverse warranty" theory distorts the concepts of implied warranty "out of all relation to reality." 2A A. Larson, the Law of Workmen's Compensation § 76.44 at 14–402. There is no express warranty here, and no such warranty arises under the Virginia sales statute, *see* Va.Code §§ 8.2–314, 315, or simply from a vendor/vendee relationship. *Jennings v. Franz Torwegge Machine Works*, 347 F.Supp. 1288, 1289 (W.D.Va. 1972), *see Santisteven v. Dow Chemical Co.*, 506 F.2d 1216, 1219 (9th Cir.1974) (manufacturer's argument that purchas-

er has independent duty to avoid subjecting manufacturer to the risk of tort liability "turns indemnity on its head."). *Id.* at 248. *Accord, Colombo v. Johns-Manville Corp.*, 601 F.Supp. 1119, 1139–40 (E.D.Pa.1984). Also, the quoted statement of Judge Friendly in *Zapico* applies with equal vigor here. (See p. 156, *supra.*)

Consequently, whether analyzed as barred by the Antideficiency Act or as not being a claim actionable under the Tucker Act, the manufacturers' contractually based claims are dismissed for failure to state claims for which relief can be granted.

### CONCLUSION

Based on the foregoing discussion, all third-party claims are dismissed for failure to state claims on which relief can be granted. This result is not only consistent with precedent and traditional application of contract principles, but policy considerations underlying the relevant statutory provisions are also well served.