JOHNS–MANVILLE CORPORATION
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

EAGLE–PICHER INDUSTRIES, INC.,

and

UNR Industries, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 465–83C, 170–83C and 16–84C.

United States Claims Court.

March 6, 1987.

4

Harvey G. Sherzer, Washington, D.C., with whom were Robert M. Bruskin, Lewis M. Barr, Charles J. Engel, James F. Worrall, Charles H. Samel, Anne M. Quigley, and Kevin C. Quin, Howrey & Simon, for plaintiffs in No. 465–83C, Dennis H. Markusson, Robert D. Batson, and Nancy E. Stead, Manville Corp., Littleton, Colo., of counsel.

William J. Spriggs, Washington, D.C., for plaintiff in No. 170–83C.

Joe G. Hollingsworth, Washington, D.C., for plaintiffs in No. 16–84C, William J. Spriggs, Donald W. Fowler, Catherine R. Baumer, Patrick R. Harkins, Gary I. Rubin, and Bonnie J. Semilof, Spriggs, Bode & Hollingsworth, of counsel.

H. Michael Semler and William E. Michaels, Washington, D.C., with whom were Harold J. Engel, Albert M. Cohen, Roger K. Davis, Anthony C. Roth, Janet F. Katz, Scott Austin, and Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

NETTESHEIM, Judge.

These cases come before the court on defendant's motion for judgment on the pleadings filed on October 31, 1986, as to *Johns-Manville Corp. et al.*, No. 465–83C, and on November 21, 1986, as to the consolidated cases of *Eagle-Picher Industries, Inc.*, No. 170–83C, and *UNR Industries, Inc., et al.*, No. 16–84C. The motions were filed several years after the pleadings were closed, and briefing was completed shortly before the scheduled trial in No. 465–83C. Plaintiffs opposed in three briefs. UNR Industries, Inc., and UNARCO Industries, Inc. (collectively referred as to "UNR"), and Eagle-Picher Industries, Inc. ("Eagle-Picher"), filed essentially identical briefs. That of Eagle-Picher was struck from the record because of disrespectful and impertinent matter Eagle-Picher, unlike UNR, failed to excise from its argument seeking an early trial date. Therefore, this order draws on UNR's brief to discuss the claims of Eagle-Picher. Oppositions were filed, defendant has replied, and argument has been held.

For purposes of both motions, defendant accepts as true all factual allegations of the complaints. Thus, in ruling on the motions, the facts presented in the complaints are taken as undisputed. Plaintiffs in all these cases, typified by Johns-Manville Corporation and Johns-Manville Sales Corporation (collectively referred to as "Johns-Manville"), filed suit in this court seeking indemnification for amounts plaintiffs have paid, or may become obligated to pay, on claims related to diseases caused by asbestos filed by or on behalf of individuals "seeking damages for injuries or death which claimants allege resulted from their employment, or the employment of their decedents, during World War II in Government-owned or controlled shipyards." Complaint, No. 465–83C, filed July 19, 1983, ¶ 50. The complaints of UNR and Eagle-Picher span a period beginning before and ending after World War II.

## FACTS

A. *Johns-Manville Corporation and Johns-Manville Sales Corporation, No. 465–83C*

Plaintiffs Johns-Manville Corporation and Johns-Manville Sales Corporation ("Johns-Manville"), at all times relevant to this action, were "engaged in the manufacture of strategic asbestos-containing materials pursuant to contracts with the Government or with others." Compl. ¶ 7. Since 1982 Johns-Manville has been involved in reorganization proceedings pursuant to 11 U.S.C. §§ 1101–1163 (1982). *Id.* ¶ 5.

The Government, acting through the United States Navy, the United States Maritime Commission, and the War Shipping Administration during the times covered in this action, was engaged in the "construction, conversion, and repair of ships" necessary for the conduct of World War II. Compl. ¶ 7.

1. *Defendant's need for ships and as-bestos-containing materials during the war*

With the outbreak of World War II, the Government, which had a Navy of less than 1,300,000 tons of major combat ships, thought to be adequate for a one-ocean Navy, was compelled to prepare for a five-ocean Navy and thus "planned to bring the total combat tonnage of the Navy to approximately 8,000,000 tons." Compl. ¶ 10. Moreover, due to the exigencies of the War, there was an increased need for merchant ships, and the Government therefore engaged "in unprecedented construction of ocean-going ships of merchant types." *Id.* ¶ 11. In tandem with the requirement for an increased Navy was a requirement for asbestos-containing products. "Asbestos was essential in construction, conversion, and repair of ships because its fireproofing and insulating efficiency increased the battle-worthiness of ships and because its light weight resulted in improved speed, fuel economy, operating range, and load capacity. At all relevant times, there was no known substitute for asbestos satisfactory for these purposes, so the Government required the use of large quantities of asbestos in the construction, conversion, and repair of Government ships." *Id.* ¶ 20.

2. *The Government's control of all shipbuilding*

In furtherance of the Government's policy of doing "everything possible to accomplish the construction and repair of combat and merchant ships as quickly as possible," it "effectively assumed control over the shipbuilding industry in the United States." Compl. ¶ 15. Work at both government- and privately-owned shipyards was conducted according to government requirements as to the number of ships constructed, "methods of construction, and shipyard working conditions." *Id.* ¶ 18. Access to the shipyards and information about the work done was strictly controlled by the Government. *Id.*

One manifestation of this control was the creation and enforcement of specifications by the Government which "were expressly incorporated into and made a part of war supply contracts for construction, conversion or repair of Government ships, and the Government prohibited all deviation from its specifications without its express approval." Compl. ¶ 21. These specifications required that asbestos be used in the materials Johns-Manville supplied. *Id.*

3. *The Government's control of the asbestos trade*

A continuous supply of asbestos fiber was considered so critical to the war effort that the Government took an active role in control of the asbestos industry. The Government determined that since certain types and grades of asbestos were of particular importance in the shipbuilding effort and were available only from Africa and the Soviet Union, they would be obtained directly from these countries, shipped to the United States on Navy vessels, and stockpiled by the Government. Compl. ¶ 24.

The Government also was engaged in allocating the country's supply of asbestos. Early in the War, for example, the Government "entered into an Approving Memorandum of Understanding" with the United Kingdom and Canada, whereby a board made up of members from each country "assumed the responsibility for the distribution of asbestos among the three countries." Compl. ¶ 25. The Government "assumed responsibility for the allocation and distribution of the share of asbestos assigned to the United States." *Id.*

To insure the supply of asbestos, determined to be a critical material for national defense, the Government issued a "series of orders which, for all practical purposes, restricted the use of asbestos to fulfillment of Government war supply contracts." Compl. ¶ 28.

4. *Johns-Manville's compliance with the Government's need for asbestos*

Since maintaining sources of asbestos was considered critical to the national defense, criminal penalties were attached to noncompliance with the Government's orders "to manufacture and supply asbestos-

containing materials of the kind, quantity, and quality ordered by the United States" or by a shipyard operating under control of the Government. Compl. ¶ 30. Johns-Manville, in fact, did enter contracts to supply asbestos-containing materials, both directly to the Government and as a subcontractor to shipyards operating under government contract. Johns-Manville performed these contracts and gave preference to performance of government contracts over others to which it was a party. *Id.* ¶ 32.

All material contract terms were dictated by the Government. Compl. ¶ 32. Although their terms can be "established from the routine practice of the Government at all relevant times with respect to these contracts," *id.*, Johns-Manville has been unable to locate copies of these wartime supply contracts.

### 5. *The Government's assumption of responsibility for worker safety*

As part of its control over the shipbuilding operation during the War, the Government "assumed complete responsibility for control of working conditions and work practices and prevention of industrial diseases in the shipyards. In addition, the Government specifically assumed responsibility for the initiation of any corrective action deemed necessary." Compl. ¶ 36.

At the direction of the Surgeon General of the United States, Waldemer C. Dreessen, former Assistant Surgeon of the United States Public Health Service (the "USPHS"), issued a report in 1938 (the "Dreessen Report"), establishing that exposure to asbestos should be kept below 5 million particles per cubic foot ("mppcf") to prevent new cases of asbestosis from appearing. This was considered the "recommended standard for occupational exposure to asbestos" during the time relevant to this suit, and the standard was known to the Government. Compl. ¶ 35. "Both the Navy and the Maritime Commission recognized that asbestosis could be an occupational hazard in the shipbuilding industry if the USPHS/Dreessen standard was not followed." *Id.* ¶ 37.

The Government failed to maintain a level below this standard and recognized its failure. Results of surveys conducted by the Government in government- and privately-owned shipyards revealed that "shipyard workers were being exposed to excessive concentrations of asbestos according to the USPHS/Dreessen standard." Compl. ¶¶ 42–44.

The Navy worked actively to prevent Public Health scientists from making "surveys of all the Navy Yards and mak[ing] recommendations for the correction of such hazards as were discovered" out of concern for causing a "disturbance in the labor element." Compl. ¶ 39. Although surveys conducted by the Government indicated that shipyard employees were working in conditions with concentrations of asbestos in excess of the USPHS/Dreessen standard, the information was "never published in the scientific literature, nor did the Government reveal the survey[s] to Johns-Manville." *Id.* ¶ 43. Articles that were published by the Navy and Maritime Commission misrepresented the findings of the surveys, concluding that work with asbestos was not dangerous. *Id.* ¶ 47. Access to the actual survey results was prevented by "classifying" them under the Espionage Act, 50 U.S.C. §§ 31–32 (1946) (repealed 1948). *Id.* ¶ 48. Due to its "exclusive control over operation of and access to the shipyards," the Government had superior knowledge of the health risks run by those employees. *Id.* ¶ 45.

### 6. *Johns-Manville's damages*

Johns-Manville seeks to recover the damages incurred as a result of suits brought against it on behalf of claimants who were injured or died allegedly as a result of exposure to asbestos manufactured by Johns-Manville and used in government-controlled shipyards during World War II. In some of those underlying suits, Johns-Manville has been found liable by a court, and in others it has made reasonable settlements with claimants. As of the date of filing suit in this court, July 19, 1983, Johns-Manville had paid approximately $768,361.09 in settlements and judgments and $185,741.55 in reasonable legal fees.

These figures were expected to increase as, at the time of filing suit, additional actions had been brought against Johns-Manville, which were as yet unresolved. Compl. ¶¶ 51–52. "Johns-Manville also incurred additional unliquidated damages due to the burden this litigation has placed on it, including, but not limited to, increased insurance costs, increased business costs, loss of business reputation, and loss of business." *Id.* ¶ 53.

### 7. *Claims for relief*

Based on the foregoing facts, Johns-Manville made ten claims for relief, later withdrawing its eighth claim by letter dated October 2, 1986.

As refined by its pretrial findings, pretrial brief, and opposition to defendant's motion for judgment on the pleadings, Johns-Manville's first, fourth, sixth, and seventh claims are based on the contention that an express or implied contract to indemnify arose between the parties. Its first claim alleges that an implied contract was created by the mandatory nature of Johns-Manville's compliance with government war supply contracts. The fourth claim premises an implied contract on the absence of a contract term placing liability for injury on Johns-Manville, indicating the parties' intent that Johns-Manville not be held liable, and on the Government's control over shipyard conditions. Johns-Manville's sixth claim finds an implied contract for indemnity in the bailment by the Government to Johns-Manville of some of the asbestos used in these war supply contracts. Johns-Manville's seventh claim states that an implied contract to indemnify Johns-Manville for amounts not covered by insurance arose from limitations placed by the Government on the public and product liability insurance that war supply contractors could carry. However, as Johns-Manville represented in argument, it has not abandoned its seventh claim that an express contract can be proved.

Defendant's motion for judgment on the pleadings contends that there can be no express or implied-in-fact contract for indemnification since a) Johns-Manville has shown no actual mutual intent to contract for indemnification; b) no government agent had authority to enter into such an indemnification contract during the time covered by the claims, because the Anti-Deficiency Act, Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251 (codified as amended at 31 U.S.C. § 1341(a)(1) (1982)), bars any open-ended indemnity; c) an implied contract for indemnification based on mandatory contract compliance is barred by the sovereign acts doctrine; d) no contract term of indemnification can be implied where an express contract exists that does not include such a term; and e) the law will not find an implied indemnification agreement where the party seeking indemnification has itself contributed to causing the loss.

Johns-Manville's second, third, and fifth claims are based on breach of implied warranty and breach of duty. The second claim alleges that an implied warranty that the asbestos-containing products would be free from defects arose from Johns-Manville's compliance with government-promulgated specifications for these products. The third claim alleges an implied warranty of enforcement of safety standards in shipyards based on the Government's assumption of the obligation to set and enforce health and safety standards for use of asbestos. Johns-Manville's fifth claim alleges breach of the Government's duty to disclose its knowledge of the exposure of shipyard workers to excessive concentrations of asbestos while requiring Johns-Manville to enter into contracts for the supply of asbestos-containing products.

Defendant responds to the claims for breach of implied warranty and breach of duty by arguing that a) contract law does not recognize a "reverse warranty" by a vendee to enforce safety standards; b) since knowledge of exposure of shipyard workers to asbestos did not affect Johns-Manville's cost of performing the contracts, there was no duty to disclose the knowledge; c) these claims may not be asserted for many of the contracts since the parties were not in privity; and d) Johns-Manville's losses are unrecoverable consequential damages.

Johns-Manville's ninth claim charges that its required compliance with the contracts to supply asbestos-containing products constitutes a taking of its property and thus entitles Johns-Manville to just compensation under the fifth amendment. Defendant argues that a) any taking claims are waived by efforts to enforce contracts governing the same transactions; b) Johns-Manville had not alleged that it received less than fair market value under the contracts; c) since a fifth amendment claim accrues at the time of the alleged taking, the claim is barred by the statute of limitations; and d) Johns-Manville seeks unrecoverable consequential damages.

Johns-Manville's tenth and final claim is for reformation or equitable adjustment of the war supply contracts on the grounds that the incidence of asbestos-related disease was not foreseeable by Johns-Manville and that the parties intended that the Government bear the risk of injuries resulting from Johns-Manville's compliance with the contracts. Defendant asserts there is no basis for reformation since a) no mutual mistake of fact is alleged; b) the Government was prevented by the Anti-Deficiency Act from entering into open-ended indemnification agreements and thus the contracts cannot be reformed to include such an agreement; c) reformation is unavailable where, as here, the party resisting reformation has received no additional benefit of the type it contemplated obtaining from the contract; and d) reformation is available only to account for changes in the cost of performance of the contract.

B. *UNR Industries, Inc., and UNAR-CO Industries, Inc., No. 16–84C*

UNR Industries, Inc., and UNARCO Industries, Inc. ("UNR"), manufactured asbestos-containing products prior to 1970. At the time of filing suit in this court, UNR had been sued by approximately 20,000 individuals alleging bodily injury or death resulting from exposure to asbestos, 13,000 of whom alleged exposure in government-owned or -operated shipyards. Complaint, No. 16–84C, filed Jan. 16, 1984, ¶ 3. UNR filed for reorganization under the Bankruptcy Code in 1982. *Id.*

1. *The Government's control of the development, manufacture, and procurement of UNR's asbestos-containing products*

During the period relevant to its suit, the Government "requested UNR to develop and produce asbestos-containing insulation products, and actively participated in the development of such products." Compl. ¶ 8. There was continuing direct contact between Navy personnel to communicate the Navy's specific requirements and UNR's employees to report development progress. These individuals worked jointly on testing the products and developing specifications governing their content. *Id.* ¶¶ 18–27. At all relevant times such specifications mandated the use of asbestos in insulating materials supplied by UNR. *Id.* ¶ 14.

"UNR's strict compliance with applicable federal government contract specifications was neither voluntary nor gratuitous...." Compl. ¶ 29. The contracts for asbestos-containing products to which UNR was a party mandated compliance with specifications. In addition UNR "complied strictly with all other government orders and directives relating to the development, testing, approval, production and procurement of" asbestos-containing materials. *Id.* ¶ 31.

Use of these asbestos-containing products at shipyards was under government control. The Government also "assumed and maintained control over and responsibility for the working conditions and worker health and hygiene at government and contract shipyards." Compl. ¶ 10. Governmental publications indicate that during the time defendant was participating in the development of UNR's insulating products and requiring that asbestos be contained in them, the Government was aware that exposure to asbestos dust was a health hazard. In spite of this knowledge, the Government negligently supervised the use of asbestos-containing products and continued to expose the shipyard workers to asbestos dust. *Id.* ¶ 12.

2. *The Government's control of UNR's asbestos-related operations*

As a result of the United States' involvement in World War II, a shipbuilding pro-

gram was undertaken that increased the American fleet from 1.3 to 8 million tons of combat vessels and produced 6,000 merchant vessels. Compl. ¶ 34. This major shipbuilding and repair effort "required enormous quantities of insulation products, and throughout the war the government continued to require the use of asbestos in such products." *Id.* ¶ 35. Due to the resultant enormous demand for asbestos, the Government became involved in supplying and stockpiling asbestos, and in January 1942 the Government assumed complete control over its supply and use so that use of asbestos was restricted to fulfilling defense orders. In early 1943 similar controls and restrictions were applied to the importation of asbestos. *Id.* ¶¶ 36–38.

The net effect of this control was that the Government supplied all of the asbestos used by UNR to manufacture insulation products for the Government during the war, and the Government continued to sell asbestos to UNR after the war. Compl. ¶¶ 39–40. However, at no time during or after the war did the Government "adequately warn UNR of the health hazards associated with exposure to asbestos at naval or contract shipyards." *Id.* ¶ 41.

The Government's need for asbestos-containing products had a major impact on the conduct of UNR's business. "By 1941, well over 60 percent of the asbestos-containing products manufactured at ... [one UNR plant] were supplied to government and contract shipyards. In calendar years 1942, 1943, and 1944, government and contract shipyards procured virtually all of UNR's total output" of asbestos products. Compl. ¶ 42. The Government's requirements exceeded UNR's production capacity by 1940, and, at government order, UNR acquired an additional plant whose output was devoted to government contracts. *Id.* ¶ 44. During the war UNR also cooperated with the Government's war effort by, for example, working with the Navy to develop and then producing, a new asbestos and glass product to meet specific needs. *Id.* ¶ 50. This cooperation included meeting "or exceed[ing] government requirements for the production of asbestos-containing

products," *id.* ¶ 54, and "was recognized officially by the Government." *Id.* ¶ 55.

### 3. *The Government's control of the use of UNR's products*

Through its "written standards and procedures for installing and removing UNR's asbestos-containing products at government and contract shipyards," Compl. ¶ 56, the Government maintained exclusive control of the use and application of those products. This exercise of control included assumption of responsibility for promulgating and enforcing health and safety standards for exposure to asbestos in shipyards. *Id.* ¶ 57. However, the Government "failed to satisfy its statutory and contractual obligations with regard to the safe use of asbestos material in government and contract shipyards." *Id.* ¶ 58.

### 4. *Claims for relief*

Based on these facts, UNR has made five claims for breach of warranty or duty. UNR's first claim contends that the Government's active participation in the development of UNR's asbestos-containing products, amounting to joint development, created a warranty of the safety of those products. UNR's second claim is that the Government warranted the accuracy, safety, and feasibility of specifications for asbestos-containing products as a result of the Government's writing and enforcing compliance with those specifications. Breach allegedly occurred since conforming products were in fact not safe.

The fourth claim alleges that a warranty that the Government would use due care in specifying and using asbestos-containing products arose from the Government's participation in their development, enforcement of specifications, and supervision of their use in shipyards while being aware of the hazards to health of exposure to asbestos. Breach occurred, *inter alia,* through the Government's lack of warnings and failure to provide safe working conditions in the shipyards.

UNR's fifth claim is for breach of the Government's duty to reveal its superior knowledge of the danger of exposure to

asbestos as that knowledge is claimed to have been vital to UNR's performance of its contracts to supply asbestos-containing products. This duty arose from the Government's requirement, through its contract specifications, that products supplied by UNR contain asbestos.

In its motion for judgment on the pleadings, defendant points out that UNR's claims 2, 4, and 5 are essentially the same as Johns-Manville's claims 2 and 5 (breach of implied warranty or duty) and that UNR's claim 1 is "simply another version of its claims based on ... warranties." Def's Br. filed Nov. 21, 1986, at 10. In moving against those claims, therefore, defendant relies on the same arguments set forth in the comparable motion directed at Johns-Manville's suit.

UNR's third claim is for breach of an implied warranty that the raw asbestos furnished by the Government and required to be used in the products sold to the Government, was "free from defects and could be used in a safe manner." Compl. ¶ 70. Defendant counters that a) since the asbestos furnished was sold to UNR, and b) since it was not furnished pursuant to a specific contract clause, it is not "government-furnished property," and thus does not carry the free-from-defects warranty. Even if there were a government-furnished property warranty, defendant contends that it would cover only increased cost of performance resulting from the defect. Defendant takes the position that the damages claimed by UNR were not performance costs but were indirect, consequential costs.

## C. *Eagle-Picher Industries, Inc., No. 170–83C*

Some 18,000 individuals have filed suit for death or injury allegedly resulting from asbestos exposure in government-owned or -controlled shipyards against plaintiff Eagle-Picher Industries, Inc. Complaint, No. 170–83C, filed Mar. 25, 1983, ¶ 3.

### 1. *The Government's contract specifications*

During the relevant time period, the Government established and required adherence to contract specifications for content, quality and testing of asbestos products procured from Eagle-Picher. Compl. ¶ 5.

### 2. *Eagle-Picher's compliance*

All asbestos-containing products furnished by Eagle-Picher complied with contract specifications, were tested by the Government, and were issued certificates of approval. Compl. ¶¶ 7–8.

### 3. *The Government's superior knowledge*

From at least 1934 the Government knew of the health risks associated with exposure to asbestos dust and in the 1940's promulgated regulations for the safe handling of asbestos. However, the Government did not follow or enforce these regulations. In spite of the Government's greater knowledge of health risks, it continued to require use of asbestos by its contracts with Eagle-Picher. Compl. ¶¶ 9–11.

### 4. *The Government's control of shipyard conditions*

The Government had control over work performed at shipyards owned by, or under contract with, the Government and took responsibility for the safety of shipyard workers by establishing safety regulations and by empowering government agents to enforce these regulations. Eagle-Picher had no control over those shipyards nor had any reason to believe that its products were being used so as to endanger the health of workers. Compl. ¶¶ 15–16.

### 5. *Claims for relief*

Based on these facts, Eagle-Picher has made three claims for relief. The first claim alleges that by undertaking to write and enforce specifications for asbestos-containing products supplied under government contracts, the Government impliedly warranted that conforming products would be safe and could be used safely (similar to Johns-Manville's and UNR's second claim). Compl. ¶ 17. The second claim maintains

that by contracting for and accepting asbestos-containing products which were used in shipyards over which the Government had control, it impliedly warranted that it would use "due care in designating, specifying, and overseeing such products at the shipyards." *Id.* ¶ 23 (similar to Johns-Manville's third and UNR's fourth claim). Eagle-Picher's final claim states that since the Government had greater knowledge of the health risks involved in working with asbestos, it had "an implied contractual duty to reveal its superior knowledge of the dangers of asbestos to Eagle-Picher." *Id.* ¶ 30 (similar to Johns-Manville's and UNR's fifth claims).

Because Eagle-Picher's claims are so similar to three of those made by Johns-Manville, defendant's motion refers to the defenses made to the comparable claims in its motion against Johns-Manville's complaint.

## DISCUSSION

### A. *Standards for motion for judgment on the pleadings*

1. RUSCC 12(c) (identical to Fed.R. Civ.P. 12(c)) provides in full:

> After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 26, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

A motion for judgment on the pleadings is made after the pleadings are closed. Where a counterclaim is filed, pleadings are closed with the filing of the answer to the counterclaim. In Johns-Manville's action, pleadings closed on March 2, 1984, and defendant's motion for judgment on the pleadings was filed on October 31, 1986. Pleadings in UNR closed August 22, 1984; and in Eagle-Picher, on November 17, 1983. Defendant's motion for judgment on the pleadings in these consolidated cases was made on November 21, 1986.

For purposes of ruling on a motion for judgment on the pleadings, the traditional standard is that a court must assume that all well-pleaded facts in the nonmovant's pleading are true and that all controverted assertions of the movant's pleadings are false, *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976), and ignore any assertions in the pleadings that amount to legal conclusions, *Olpin v. Ideal Nat'l Ins. Co.*, 419 F.2d 1250, 1255 (10th Cir.1969). With the facts no longer in controversy, only questions of law remain, and the court's ruling on the motion is based on the substantive merits of the claims and defenses as alleged in the non-movant's pleading. The motion therefore cannot be granted if the non-moving party has alleged facts that, if proved, would prevent the movant from prevailing. *Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967); *J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d 77, 78–79 (5th Cir.1962). If issues of fact are unresolved in the pleadings, they cannot be decided in ruling on a Rule 12(c) motion. *Halliday v. United States*, 7 Cl.Ct. 315, 321 (1985). And if an unresolved factual issue is material, the motion cannot be granted. *Duhame v. United States*, 127 Ct.Cl. 679, 684, 119 F.Supp. 192 (1954).

The United States Court of Claims adopted a more rigorous standard for granting a motion for judgment on the pleadings:

> A motion for judgment on the pleadings should be denied unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim. *Brown v. Bullock*, 194 F.Supp. 207 ([S.D.N.Y.] 1961), *aff'd* 294 F.2d 415 ([2d Cir.] 1961); *Rosenhan v. United States*, 131 F.2d 932 ([10th Cir.] 1942), *cert. denied*, 318 U.S. 790 [63 S.Ct. 993, 87 L.Ed. 1156] (1943); *Kohen v. H.S. Crocker Co.*, 260 F.2d 790 ([5th Cir.] 1958)....

*Branning v. United States*, 215 Ct.Cl. 949, 950–51 (1977). Although *Brown* and the

other cited cases restate only the traditional formulation that a motion for judgment on the pleadings admits facts, but not conclusions of law, other courts have adopted this more rigorous standard, *see Bloor v. Carro*, 754 F.2d 57, 61 (2d Cir.1985),[1] and the United States Claims Court has utilized it in *Schultz v. United States*, 5 Cl.Ct. 412, 415 (1984).

■ There is a strong policy in federal courts in favor of ensuring a litigant a full and fair hearing on the merits of a claim. *See, e.g., Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C.Cir.1986). Since summary disposal of cases is in opposition to this policy, a strict standard is generally applied in ruling on Rule 12(c) motions. *Roemhild v. Jones*, 239 F.2d 492, 494 (8th Cir.1957). This court therefore applies the *Branning* standard because it errs in favor of retaining the claims for trial. In ruling on defendant's motions, the court has excluded from consideration matters outside the pleadings, except insofar as plaintiffs briefed or argued factual scenarios that might be proved in support of their claims. Therefore, the sufficiency of the claims plaintiffs have stated in their complaints, or reframed in Johns-Manville's pretrial filings, or constructed in response to defendant's arguments is judged by a standard that measures all facts thus far identified taken against the legal components of a given cause of action to see if a valid claim has been stated.

RUSCC 12(c) caveats that a party may move for judgment on the pleadings "within such time as not to delay the trial." On April 11, 1986, counsel for Johns-Manville and the Government signed a scheduling order setting trial for March 16, 1987. On November 3, 1986, as revised on January 16, 1987, Johns-Manville filed four volumes of proposed findings of fact in support of its claims, along with a memorandum of law. Trial is scheduled to begin on April 20, 1987. The parties have agreed to extend the trial date to April 20, 1987. Trial of UNR and Eagle-Picher's cases is scheduled for August 1987.

■ Defendant's motions were filed and briefed in tandem with Johns-Manville's filing of pretrial materials, and it is most unusual to adjudicate threshold issues of whether the complaints state claims for relief as the parties in the lead case are making their final preparations for trial. Since these cases were assigned to this judge in July 1986, after the trial date for Johns-Manville's case had been set, it is impossible to allocate responsibility for this situation. Suffice it to say that consideration of the motions will not delay trial beyond the extension from March 16 to April 20, 1987, agreed to by the parties.

■ Although a motion for judgment on the pleadings should not delay a trial, it should pretermit trial of issues that do not survive its rigorous standards. As such, these motions aid judicial administration and economies of litigation. The arguments that defendant musters against the claims in these three cases have been presented in advance of trial to other courts in litigation against the Government by manufacturers of asbestos-containing products and defendant has been successful in blocking all contract claims on either motions to dismiss or for summary judgment. However, because Johns-Manville conscientiously and to great expense has prepared for trial (and since percipient witnesses are aged or ill), the court has weighed most carefully the effect of grant-

---

**1.** The provenance of the *Branning* standard, although not traceable to the cases cited, is legitimate. *Bloor* quotes *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977), for the standard that a motion will not be granted unless ' "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' In turn, the Second Circuit cites *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957), the hallmark case on the standards for a motion to dismiss: A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley* has been lionized only in connection with motions to dismiss. However, applying the *Conley* standard to a motion for judgment on the pleadings makes sense because such a motion is really a motion to dismiss when offered up by defendant after the answer has been filed, instead of before.

ing defendant's motions on trial of Johns-Manville's claims, as well as on the trial of the consolidated UNR and Eagle-Picher cases.

### B. *Effect of order denying prior related motion*

UNR attaches talismanic significance to a decision of the former United States Court of Claims in *Keene Corp. v. United States*, No. 579–79C (Ct.Cl. May 1, 1981) (per curiam) (order denying motion for summary judgment and granting leave to file first amended petition). According to UNR, the Court of Claims almost six years ago denied the same motion that defendant now presses and plaintiffs in the asbestos litigation in this court have relied on that ruling ever since.

The one-paragraph order of May 1, 1981, states that the "first amended petition states a claim cognizable by this court if proved, and therefore should be filed...." and denies defendant's motion for summary judgment without prejudice:

> Though we have decided that the amended petition survives the equivalent of a motion to dismiss, the trial judge has full authority, in his discretion, to order a more definite statement or to take such other action as he deems appropriate to focus the issues more clearly or definitely....

*Id.*, slip op. at 2.

Having filed its complaint in 1979, Keene Corporation ("Keene") has the oldest of the ten asbestos cases filed by seven plaintiffs now pending in this court. The amended petition in *Keene Corp.*, filed on May 1, 1981, consists of four claims or causes of action. The first claims a breach of warranty of safe use, pleading an obligation to use asbestos-containing products safely as the basis for an implied-in-fact contract of indemnity; the second, breach of a duty to reveal superior knowledge; the third, breach of an implied warranty of safe design; and the fourth, a breach of implied warranty of fitness for a particular purpose. In these circumstances the language of the May 1, 1981 order that the "first

amended petition states a claim cognizable by this court...." is disconcerting in that the four claims in *Keene* are not the same claim. Moreover, it cannot be determined from defendant's August 1, 1980 motion for summary judgment exactly which arguments were rejected as bottomed on disputed material facts (one candidate is the issue whether the Government sold asbestos-containing products to Keene on an "as is" basis). Indisputably, the order did not discuss at all several jurisdictional arguments (for example, the argument that the action was barred by 28 U.S.C. § 1500 (1976), which deprives this court of jurisdiction of the same claim pending in another federal court, or the argument that the amended petition asks essentially for declaratory relief).

Judge Lydon had occasion to construe the May 1, 1981 *Keene* order on September 15, 1983, when he denied a motion to dismiss in the nature of a motion for a more definite statement in *Eagle-Picher Industries, Inc. v. United States*, No. 170–83C, and *GAF Corp. v. United States*, No. 287–83C:

> The panel of the Court of Claims decided that Keene's amended petition survived the government's opposition thereto which was viewed by the panel as "the equivalent of a motion to dismiss...." Defendant thereafter filed its answer to the amended complaint in the *Keene* case. The complaints in these two cases are as specific and as detailed as the amended petition in the *Keene* case and are deemed sufficient to survive defendant's motion to dismiss.

*Eagle-Picher Industries, Inc. v. United States*, No. 170–83C, slip op. at 2 (Cl.Ct. Sept. 15, 1983). Judge Lydon ruled that the claims stated claims for relief only insofar as they described sufficiently the claims and contracts involved.

A successor judge would be remiss to put his imprimitur on a case by modifying an order, such as the May 1, 1981 *Keene* order, that has charted the course of

proceedings for years. The law of the case doctrine [2] insures against this result:

"The doctrine of law of the case 'expresses the practice of courts generally to refuse to reopen what has been decided.' *Messigner v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). Thus, 'once a case has been decided on appeal, the rule adopted is to be applied, right or wrong, absent exceptional circumstances, in the disposition of the lawsuit.' *Schwartz v. NMS Industries, Inc.,* 575 F.2d 553, 554 (5th Cir. 1978)." *United States v. Turtle Mountain Band of Chippewa Indians,* 222 Ct.Cl. 1, 6, 612 F.2d 517, 520 (1979). The doctrine rests upon the important public policy that "[n]o litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time." *Id.* "The purpose of the law of the case principle is to provide finality of judicial decisions." *Id.* 612 F.2d at 521; *see also Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 634 F.2d 557, 561–62 (1980).

*Gindes v. United States,* 740 F.2d 947 (Fed.Cir.), *cert. denied,* 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984); *accord Branning v. United States,* 784 F.2d 361, 363 (Fed.Cir.1986). The Federal Circuit recognized in *Gindes* that the law of the case should be adhered to barring one of three "'exceptional circumstances.'" *Gindes,* 740 F.2d at 950. One exception is that the decision was clearly erroneous and would work a manifest injustice. *Id.* at 950; *accord Branning,* 784 F.2d at 363.

 It is respectfully considered that, based on the ensuing discussion, the court

is "convinced to a certainty" that the May 1, 1981 order of the Court of Claims denying the motion to dismiss the claim for breach of a warranty of safe use was "incorrect," *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 201, 634 F.2d 557, 562 (1980), for several reasons. First, the 1981 order (and consequently the September 15, 1983 order of the Claims Court) does not discuss defendant's arguments or Keene's responses. Second, Johns-Manville's complaint makes nine claims, and the 1981 order validated four that correspond to four of Johns-Manville's and four of UNR's. The order therefore would not be dispositive of all defendant's arguments, in any event. Third, significant adverse decisions from federal trial and appellate courts (in cases involving the same asbestos manufacturers) have issued since May 1, 1981. They are decisions on motions to dismiss or the equivalent and are subsequent case law of substance deserving discussion. Fourth, the 1981 order did not decide rights or liabilities or the merits of plaintiffs' claims. It may be viewed as the type of summary ruling denying a motion to dismiss by a trial court that was reconsidered and granted by a subsequent judge assigned the case involved in *Champaign-Urbana News Agency v. J.L. Cummins News Co.,* 632 F.2d 680, 683 (7th Cir.1980), in which law of the case was not a bar.

## C. *Claims for express and implied-in-fact contract*

### 1. *Contract claims cognizable in the Claims Court*

 The heart of Johns-Manville's complaint is an action in implied contract for

---

**2.** General Order No. 1(1), 1 Cl.Ct. XXI (1983), permits the Claims Court to modify any unpublished order of the appellate division of the Court of Claims in a case now pending in the Claims Court, even if the order was rendered on summary judgment. The Federal Circuit in *Gindes v. United States,* 740 F.2d 947, 949–50 (Fed.Cir.), *cert. denied,* 429 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984), treated as law of the case a prior published decision of the Court of Claims appellate division (described as a "lengthy decision," *id.* at 949) granting partial summary judgment. *Gindes* will be followed although distinguishable.

Plaintiffs do not argue law of the case to uphold the May 1, 1981 order. Johns-Manville does not even rely on that order. The court has raised the doctrine of the law of the case because it proceeds cautiously in not giving law of the case effect to the May 1, 1981 order of the Court of Claims and in determining that the September 15, 1983 order of Judge Lydon, if it implies a ruling that the complaints state claims for relief, should not be entitled to comity. *See Champaign-Urbana News Agency v. J.L. Cummins News Co.,* 632 F.2d 680, 683 (7th Cir.1980).

indemnification. It is illuminating that one of Johns-Manville's proposed findings can be read to set forth the elements of a classic implied-in-law contract that is beyond the jurisdiction of this court to consider. *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980). In contrast to a contract implied in fact, one implied in law implies agreement of the parties from the circumstances; assent of the parties is lacking; and the intention of the parties is not ascertained—rather, an obligation is imposed by law to bring about justice regardless of the parties' original intentions. *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255–56 (1970).

Johns-Manville's proposed finding No. 602, which is an amalgam of other detailed proposed findings, reads:

> The relevant conduct, facts and circumstances which give rise to this implied-in-fact obligation include: (a) the mandatory and compulsory nature of the obligations imposed by the Government on Johns-Manville ... [all ellipses cite to other proposed findings]; (b) the Government's controls over asbestos fiber and the products which contained such fiber ...; (c) the Government's development, promulgation, and enforcement of strict specifications which required that the products described therein contain asbestos fiber ...; (d) the Government's control over the shipyards in this country, including the methods, procedures and precautions to be taken in handling and using asbestos-containing products in the construction and repair of ships ...; (e) the Government's knowledge long before World War II of the potential danger of asbestosis in shipyard workers and of the means to prevent it ...; (f) the Government's statements, warranties and representations that it was enforcing and ensuring compliance with its asbestos health and safety requirements in the shipyards, and that shipyard conditions were not hazardous ...; (g) Johns-Manville's compliance with all obligations imposed on it by the Government's contracts, orders, directives, regulations and

statutes and its whole-hearted cooperation above and beyond its written contract duties ...; (h) the Government's "unique" ability to foresee the potential catastrophic liabilities to Johns-Manville as a direct result of the Government's acts and omissions ...; and (i) the Government's assurances that contractors were to be treated fairly and that compliance with its demands during World War II would not subject them to the risk of economic harm as a result of their performance of wartime contracts....

Plfs' Revised Proposed Findings of Fact and Conclusions of Law, No. 465–83C, filed Jan. 16, 1987. These factual assertions, taken together, form the basis for an inference that the Government should be obligated to Johns-Manville based on the relationship between the parties. However, they also describe breaches of contractual warranties or duties.

■ The Supreme Court has recognized that, in the absence of an express agreement of indemnity, a stevedoring contractor can be obligated to reimburse a shipowner for injuries to a third party caused by the former's improper storage of cargo. *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 133–34, 76 S.Ct. 232, 237–38, 100 L.Ed. 133 (1956):

> The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. *This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship.* It is of the essence of petitioner's stevedoring contract. *It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufacturered product. The shipowner's action is not changed from one*

*for a breach of contract* to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service.

(Emphasis added; footnote omitted.) The cause of action is not an implied contract for indemnity, but breach of an obligation that a contract imposes expressly or by implication. In other words, a contractor can be held liable to indemnify as the consequence of a breach, which is not creation of a contract by operation of law. An implied-in-fact contract similarly does not arise from a breach. Instead, a contract to indemnify that is implied in fact must be proved apart from any notion of breach.

■ The confusion between claims based on contract formation and breach is important. The former are subject to the Anti-Deficiency Act, which prevents the enforcement of contracts that obligate the payment of funds beyond appropriations; the latter are not, because they are based on contracts themselves that do not violate the Anti-Deficiency Act. *See infra* note 4. Furthermore, imputing notions of contract formation into analysis of breach claims invites defendant to argue that breaches of warranty should be rejected because they impose obligations by operation of law, *i.e.*, that they are proscribed contracts implied in law. Since most contractual warranties and duties are implied in law, defendant's argument would have the effect of immunizing the Government from standard claims for breach of implied warranties or duties attendant on contract performance.

The courts unfortunately have fueled defendant's argument. For example, in *Murray v. United States*, 405 F.2d 1361, 1367 (D.C.Cir.1968), the court described the underpinnings for an implied-in-fact contract for indemnity under the Tucker Act. The third-party complaint sought indemnity based on the theory that the Government impliedly contracted in a leasing agreement to maintain the premises in safe manner. The lessor was sued for personal injuries sustained as a result of the Government's dereliction. After the lessor brought the Government into the litigation on an indemnity claim, the D.C.Circuit, adopting Judge

Learned Hand's reasoning in *Slattery v. Marra Bros.*, 186 F.2d 134, 138–39 (2d Cir. 1951), distinguished between an indemnity claim based on differences and degrees of fault, traditionally cognizable as a tort claim, and an indemnity claim arising out of facts and circumstances other than linkage with the same victim and establishing an independent duty based on contract or possibly tort. The D.C.Circuit planted jurisdiction of this latter claim under the Tucker Act. What is described, however, is a simple claim for breach of the duty to maintain safe premises that might give rise to an indemnity obligation, not an implied-in-fact contract to indemnify.

■ If defendant's vice is to deny breach claims on the ground that the claims are for implied-in-law contracts, plaintiffs' contribution to the confusion is to argue that damages are measured as if what was breached was an implied-in-fact contract of indemnity. Plaintiffs should be disabused of this approach before trial. Any breach of warranty or duty must be a breach cognizable in this court, and the controlling law permits recovery for increased performance costs only, so that an element of the breach is the increase to costs of performance. Thus, to sustain their breach claims, plaintiffs must prove that third-party liabilities were considered costs of performance at the time of contract. If plaintiffs can make their proof, all foreseeable damages flowing from the breach will be recoverable.

### 2. *Claims based on express contract*

An express contract is an agreement or mutual assent by the parties manifested in words, oral or written. *Gratkowski v. United States*, 6 Cl.Ct. 458, 461 (1984). Even when a party contracts with the Federal Government, it is not essential that the contract be in written form. *Narva Harris Construction Corp. v. United States*, 216 Ct.Cl. 238, 244, 574 F.2d 508, 511 (1978); *Penn-Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 1085, 354 F.2d 254, 266–67 (1965). Also, this Court, and its predecessor, have on various occasions found for con-

tractors that have alleged and proven implied-in-fact contracts. *Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1352 (Fed.Cir.1983); *Terteling v. United States*, 167 Ct.Cl. 331, 339–40, 334 F.2d 250, 255–56 (1964); *Tidewater Coal Exchange v. United States*, 67 Ct.Cl. 590, 600 (1929).

*Peoples Bank & Trust Co. v. United States*, 11 Cl.Ct. 554, 566 (1987). Defendant argues that, validating all facts pleaded in Johns-Manville's complaint, proposed findings, pretrial brief, and opposition, Johns-Manville has failed to allege the basis for a contract of express indemnification. Johns-Manville admits that there are no integrated express writings supporting its claim. Rather, it alleges that the Navy adopted a policy of self-insurance for risks of third-party catastrophic hazards, which was constructively incorporated in Johns-Manville's sales contracts. Defendant admits for purposes of its motion the existence of an unwritten policy, but argues that it could not be incorporated constructively into Johns-Manville's contracts. Defendant contends that there is no requirement of statute, regulation, or directive that the unwritten policy of self-insurance for third-party liabilities be written into Johns-Manville's contracts. Johns-Manville more or less so states in its proposed finding No. 593, but *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 15, 312 F.2d 418, 426, *reh'g denied*, 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), inserts substantive contract provisions when a statute or regulation requires they be written into contracts. Defendant prevails as a matter of law on the issue of constructive incorporation.

This ruling does not militate against Johns-Manville's allegations that authorized representatives of the Navy expressly assumed the risk of loss. It is understood that Johns-Manville's proof of an express contract of indemnification will be based primarily on witness testimony as corrobo-

rated by evidence of the Government's contractual practices with similar supply contracts. At this point it cannot be said that the facts alleged cannot be borne out by competent testimony.[3]

3. *Claims based on implied-in-fact contract*

In order to prove the existence of an implied-in-fact contract, the claimant must "show mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *Orchards v. United States*, 749 F.2d [1571] at 1575 [Fed.Cir. 1984] (citing, *inter alia*, *City of Alexandria v. United States*, 737 F.2d 1022 (Fed.Cir.1984)); *see Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1359–60 (Fed.Cir.1983); *Jarboe-Lackey Feedlots, Inc. v. United States*, 7 Cl.Ct. 329, 339–40 (1985); *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 338–39 (1983), *aff'd mem.*, 738 F.2d 452 (Fed.Cir. 1984); *Prevado Village Partnership v. United States*, 3 Cl.Ct. 219, 223–24 (1983); *Wertz v. United States*, 2 Cl.Ct. 45, 51–52 (1983).

*Johnson Controls, Inc. v. United States*, 8 Cl.Ct. 359, 366–67 (1985), *aff'd per curiam*, 795 F.2d 1011 (Fed.Cir.1986).

The standards are exacting, and only in a few cases has an implied-in-fact contract been sustained by the Federal Circuit or Court of Claims. *Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1352 (Fed. Cir.1983); *Terteling v. United States*, 167 Ct.Cl. 331, 339–40, 334 F.2d 250, 255–56 (1964); *Tidewater Coal Exchange v. United States*, 67 Ct.Cl. 590, 600 (1929).

Few of the cases in the former Court of Claims—and the Federal Circuit has not addressed any—deal with indemnity contracts. In *Terteling* the Court of Claims recognized an implied-in-fact agreement to indemnify. Plaintiff contractors in *Terteling*, who were sued by third parties for

---

3. On February 12, 1987, defendant asked that the court reserve a ruling on Johns-Manville's claims for express and implied-in-fact contract, converting them for disposition into a motion

for summary judgment pursuant to RUSCC 12(c). Were trial not imminent, defendant's request would have been granted.

gravel taken from pit sites, notified the Government that they expected to be reimbursed for the costs and expenses incurred in defending lawsuits pursuant to a contractual provision calling for the Government to furnish the pits "without cost to the contractor." The court held that the Government breached the contract by failing to defend the actions against the contractors:

> Therefore, when the United States contracted to furnish gravel pit sites without cost to the contractors, it not only expressly stated it would be without cost, but impliedly agreed in fact that it would do nothing which would result in any cost to the contractors. In other words, the contract was not limited in any way to exclude reimbursement of litigation costs involved in this claim.

167 Ct.Cl. at 340, 334 F.2d at 256 (footnote omitted). This case suggests that an implied-in-fact contract for indemnification must have a nexus to express contract provisions.

■ At a minimum to support an implied-in-fact contract there must be contractual language implying indemnification or conduct that shows mutual assent. The conduct cannot be one-sided. *Chicago Union Station Co. v. United States*, 103 Ct.Cl. 146, 160 (1945), refused to imply an agreement to indemnify. The court said that express provisions would be required to "raise such unlimited tort liability." However, in that case there had been an express agreement to indemnify during the period of construction, and plaintiff unsuccessfully sought to extend that express agreement to cover an accident not related to construction. *California-Pacific Util. Co. v. United States*, 194 Ct.Cl. 703 (1971), involved an attempt to reform a permit agreement to include a provision to indemnify plaintiff for monies expended by plaintiff's insurance carrier in settling a third-party tort action against plaintiff. The court held that there was no intent to indemnify because the requisite representations had not been made, especially in the face of specific assurances that plaintiff would be reimbursed only for property damage or for damages to third parties for interrupted services. 194 Ct.Cl. at 717–18. The terms of the permit thus constituted the metes and bounds of the agreement between the parties.

■ Although the case law in this court does not countermand Johns-Manville's theory, the facts must show the requisite mutuality of intent and a definite offer and acceptance. Defendant is correct that general statements to the public that contractors would be treated fairly, honestly, and in good faith do not establish a definite offer. Nor does Johns-Manville's allegation that it cooperated in the war effort constitute the requisite acceptance. However, Johns-Manville's allegations, proffers, and argument state a claim that Johns-Manville negotiated fixed-price contracts to exclude both reserves for risks of third-party liability and insurance premiums because the Government insisted on implementing a program of self-insurance that reduced the cost of supply contracts. *See Peter v. United States*, 6 Cl.Ct. 768, 779 (1984) (order denying motion to dismiss). It is true that UNR makes only a strained allegation on point, Compl. ¶ 60, and Eagle-Picher does not make any, but it is only fair to give these plaintiffs the benefit of Johns-Manville's proposed findings and to accept UNR's and Eagle-Picher's argument that they will prove up such a basis for an implied-in-fact contract of indemnity. Failing proof of what transpired at the negotiating table, or conduct tantamount to price negotiations, the claims to implied-in-fact contract by these plaintiffs cannot succeed.

### 4. *Anti-Deficiency Act*

The Anti-Deficiency Act (the "ADA"), 31 U.S.C. § 1341(a)(1) (1982), provides in relevant part that the Federal Government may not, through its officers or employees,

(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or

(B) involve [the] government in a contract or obligation for the payment of

money before an appropriation is made unless authorized by law.

The version of this statute that was in effect from 1906 through 1950 (including the World War II years) contained essentially the same language:

> No Executive Department or other Government establishment of the United States shall expend in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract or other obligation for the future payment of money in excess of such appropriations unless such contract or obligation is authorized by law.

Act of Feb. 27, 1906, ch. 510, Pub.L. No. 59–28, 34 Stat. 27, 49.

■■ Defendant argues that the ADA bars Johns-Manville's claims of express and implied agreements of indemnification[4] because such agreements would be void under the ADA. In particular, defendant characterizes the alleged indemnity agreements as creating an "incalculable and unlimited" potential liability for the Government. Def's Br. filed Oct. 31, 1986, at 23. According to defendant, the ADA prohibits federal agencies from entering into indemnity agreements that would create "open-ended" contingent liability. *Id.*

In argument Johns-Manville conceded that the alleged agreements themselves contained no limitation of potential government liability. However, Johns-Manville contends that the indemnity agreements were valid, despite the ADA, for several reasons. First, Johns-Manville argues that the existence of Navy appropriations during World War II (at the time the alleged indemnity agreements were made) in excess of Johns-Manville's claimed damages is sufficient to satisfy the ADA's limitation of expenditures and obligations to the amount of the appropriation for that expenditure or obligation.

■■ This view finds little or no support in the case law or in administrative decisions. Johns-Manville cannot cite to a case holding that the ADA allows the Government impliedly to agree to indemnify a manufacturer with which it contracts for the manufacturer's liability to a third-party user of the products sold to the Government. In *Lopez v. Johns-Manville*, 649 F.Supp. 149, 158–59 (W.D.Wash.1986), *appeal docketed*, Nos. 86–3905, 3916, *et al.* (9th Cir. June 18, 1986), the district court rejected a third-party claim by Eagle-Picher against the Government, based on express or implied agreements to indemnify, because the court concluded that the ADA barred the alleged agreements. The court explained, "An agreement by the Government to indemnify a product seller for future tort liability that the seller may incur as a result of a government employee's use of the product would create a future obligation of unknown magnitude...." *Lopez*, at 158. Unfortunately, *Lopez* includes no description of the precise nature of the indemnity agreements relied upon. The court instead appears to assume that the extent of the indemnification was to have been unlimited.

Similarly, *In re All Asbestos Cases*, 603 F.Supp. 599 (D.Hawaii 1984), the court held that the ADA barred implied agreements by the Government to indemnify asbestos manufacturers against tort liability to third parties, "absent specific authorization or appropriation." *Id.* at 611; *see also California-Pacific Util. Co.*, 194 Ct.Cl. at 715–16 (refusing to reform government contract to include indemnity provision proscribed by the ADA).

Decisions of the Comptroller General make it clear that the ADA ordinarily prohibits the Government from including indemnity agreements in its contracts that might subject the Government to unlimited liability. *E.g.*, 35 Comp.Gen. 85, 87 (1955). The few situations in which the Comptroller General has permitted exceptions were

---

**4.** Defendant also attempts to interpose the ADA as a bar to Johns-Manville's breach claims by arguing that Johns-Manville's claimed breach damages are unrecoverable consequential damages and are recoverable only through indemnification, so that the ADA renders Johns-Man- ville's alleged indemnification agreements void. The ADA does not apply to breach claims. The determination of whether consequential breach damages are recoverable involves the inherently factual issue of whether the damages were foreseeable and must await resolution at trial.

narrowly drawn and based on factual circumstances that do not lend themselves particularly to favorable comparison with the instant case. In one decision, 59 Comp. Gen. 705 (1980), the unqualified demand for inclusion of an unlimited indemnity agreement came from a monopolistic public utility. The absence of an alternative source of utility service for the Government and the opportunity for participation by the Government in administrative hearings prior to the utility's adoption of the indemnity requirement provided the basis for that exception. *Id.* at 706, 707. In another decision, 63 Comp.Gen. 145 (1984), the Comptroller General found that the Navy's contractual right to terminate a ship-chartering contract set a ceiling on the Government's contingent liability under an indemnity provision. *Id.* at 148.

Johns-Manville does cite a decision, 22 Comp.Gen. 892 (1943), approving the United States Maritime Commission's offer to amend its contracts for seaworthiness testing of vessels to conform to the Commission's self-insurance policy. The self-insurance policy apparently was the same one that Johns-Manville alleges governed its contracts with the Commission and the Navy. The Comptroller General approved the amendments to the vessel-testing contract only with the proviso that "the liability of the Government under the amendments will not exceed the coverage of the insurance policies as to which reimbursement of the cost of the premiums is discontinued...." *Id.* at 895. It is unclear from the decision whether the amendments incorporating the Government's self-insurance policy were to include a specific monetary limitation of liability or only a reference to the limit of the contractor's existing insurance coverage. It is also unclear what specific indemnity language the proposed contract amendments contained, since they apparently were not submitted to the Comptroller General. *Id.* at 893. And it is unclear what relationship the amount of the proposed increased contingent liability had to existing appropriations.

Despite the similarities in subject matter and time period between this decision and the instant case, one significant deficiency in the decision prevents the court from according it much weight: The decision fails to mention the ADA. It is impossible to determine whether the Comptroller General simply overlooked the statute, or whether instead he did not consider the ADA to pose any barrier to the proposed indemnity provisions because of the limitations described.

Nevertheless, common sense and the predominant import of the case law lead the court to reject Johns-Manville's contention that the ADA's prohibition is avoided by total Navy appropriations during World War II in excess of Johns-Manville's claims. Such a view would require a post-hoc analysis of the validity of the indemnification agreements, comparing the appropriations available at the time the agreements were entered into with the claims submitted many years later under the agreements. More importantly, however, the illogic in presuming that the entire amount of Navy appropriations would have been subject to possible use for indemnification of contractors, when there were unquestionably other expenses to be charged against those same appropriations, would subvert the ADA's purpose of preventing government officials and employees from obligating Congress to spend more money than it has appropriated. *See* 21 Op.Atty.Gen. 244, 248 (1895).

Johns-Manville next argues that the First War Powers Act, Pub.L. No. 77–354, 55 Stat. 838 (1941), and Exec.Order No. 9,001, 6 Fed.Reg. 6,787 (1941), diminished the effect of the ADA during the war. Johns-Manville cites language in Title II of the First War Powers Act that granted the President the power to "authorize any department or agency" engaged in the war effort "to enter into contracts and into amendments or modifications of contracts ... without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts." This act can be construed as granting the President the authority to delegate to departments and agencies contracting power virtually unfettered by contract law, includ-

ing the ADA. By issuing Exec.Order No. 9,001, the President delegated this power to the Navy and War Departments and the United States Maritime Commission.

■■■■ However, the Executive Order authorized them to exercise this contracting power only "within the limits of the amounts appropriated therefor." The effect of this limitation was nearly identical to that of the ADA. Just as the ADA prohibited government officials from spending or obligating an amount in excess of appropriations for the particular purpose, the language of the Executive Order delegated this broad power to make or amend contracts only insofar as the exercise of that power did not exceed the amounts appropriated for those contracts. Just as an indemnity agreement exposing the Government to potentially unlimited liability would create an obligation in excess of appropriations (a violation of the ADA), the same agreement would be an exercise of the power to make or amend contracts that goes beyond "the limits of the amounts appropriated therefor" (and therefore is an action not authorized by the Executive Order). Since the combined effect of the First War Powers Act and Exec. Order No. 9,001 was to free the three government entities mentioned above from the constraints of contract law provisions such as the ADA, the inclusion of indemnity agreements in Johns-Manville's contracts would not be violations of the ADA by the government contracting officials. Rather, they were actions beyond the scope of the legal authority of the officials to obligate the Government. Such actions do not bind the Government to contracts so entered or amended. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Gratkowski v. United States*, 6 Cl.Ct. 458, 461 (1984). Therefore, Johns-Manville's claims based on alleged express or implied-in-fact contracts for indemnity must be dismissed as a matter of law.

It seems quite likely that government officials with whom Johns-Manville dealt considered neither the ADA nor the language of Exec.Order. No. 9,001 to be limi-

tations on their power to agree to indemnify provisions. Indeed, Johns-Manville points to an opinion of the Attorney General, 40 Op.Atty.Gen. 225 (1942), interpreting the delegation of authority under the First War Powers Act and Exec.Order No. 9,001, that remarks repeatedly on the expansive nature of the powers granted, including the authority to contract " 'without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts.' " *Id.* at 228 (quoting First War Powers Act). Appendix II of the opinion even provides a hypothetical indemnification agreement scenario between the Corps of Engineers and a dredging contractor as an example of an agreement the Attorney General would approve. *Id.* at 240. Nevertheless, that the Attorney General and other government officials, in their honest efforts to facilitate the war effort, may have misunderstood or ignored the limitations on powers to contract and genuinely believed unlimited indemnification agreements to have been valid and essential does not render them valid or enforceable in the face of contrary language in Exec.Order No. 9,001.

There is merit in some circumstances in refusing the Government's attempt to escape a contract that obligates it to spend more than has been appropriated for a certain purpose. As the Court of Claims noted on at least two occasions, "[P]ersons contracting with the Government for partial service under general appropriations are [not] bound to know the condition of the appropriation account at the Treasury or the contract books of the Department ...," *i.e.*, whether part or all of the general appropriation has already been spent or obligated. *Dougherty v. United States*, 18 Ct.Cl. 496, 503 (1883); *see also Ferris v. United States*, 27 Ct.Cl. 542, 546 (1892). However, the situation in which a party contracting with the Government cannot determine readily whether sufficient funds remain unobligated from the general appropriation to cover its contract differs significantly from the situation in which a party contracts for indemnification by the Government knowing that the obligation of potential liability exceeds appropriations

(either by virtue of its "open-ended" terms or by the party's belief that potential liability reaches the level of total appropriations where other expenditures have been or are being made out of the same appropriations). Voiding the Government's obligation under the latter scenario does not work the injustice that the Court of Claims recognized under the former scenario. Johns-Manville simply cannot be said to have been unaware of the relation between the scope of the obligation under its alleged indemnity agreements and the amount of the appropriations to the Navy.

Johns-Manville's attempt to remove the indemnification agreements from the constraints of the ADA (and of Exec. Order No. 9,001) on the basis of their status as "contingent liabilities" is unpersuasive. Contractual agreements that create contingent liabilities for the Government serve to create obligations of funds just as much as do agreements creating definite or certain liabilities. The contingent nature of the liability created by an indemnity agreement does not so lessen its effect on appropriations as to make it immune to the limitations of either the ADA or Exec. Order No. 9,001. *See, e.g.,* 63 Comp.Gen. 145, 147 (1984) ("All types of contingent liabilities involve a risk that occurrence of the applicable contingency could result in an obligation in excess of available funds.").

There are two possible sets of facts that might have persuaded the court to uphold the alleged indemnity agreements. They were not pleaded or argued by Johns-Manville. First, the ADA's language makes an exception to the requirement that funds first be appropriated before contracts or obligations for money are made; the exception is when "authorized by law." 31 U.S.C. § 1341(a)(1)(B). If Johns-Manville had pleaded or argued that Navy authorizations specified funding for indemnification of contractors (apart from appropriations allocated to other Navy expenses) or that a separate source of law authorized the indemnity agreements, Johns-Manville's agreements might have fit within this exception.

Second, if Johns-Manville had pleaded or argued that both parties to the alleged indemnity agreements had understood at the time of contracting that the potential liability created by them was limited to a portion of existing Navy appropriations not allocated to any other Navy purpose, this argument might have prevailed. Since neither argument was made, Johns-Manville's claims for breach of express or implied agreements of indemnification must be dismissed because the alleged agreements were entered into by government officials acting beyond the scope of their authority. The restrictive language contained in Exec. Order No. 9,001 prevented officials of the War and Navy Departments and Maritime Commission from receiving authority to contract beyond the limit of appropriations.

As a consequence the identical claims by UNR and Eagle-Picher based on express and implied-in-fact indemnification contracts must also be dismissed.

5. *Bailment and government-furnished property*

Johns-Manville's sixth claim alleges that the Government created a bailment of the asbestos fiber it supplied to Johns-Manville by retaining actual or constructive title to it. From the alleged bailment situation, Johns-Manville perceives an implied or express warranty that the asbestos "would be safe for use in the shipyards." Johns-Manville's Br. filed Jan. 9, 1987, at 87.

A bailment contract that serves as the basis for recovery in this court must be either express or implied-in-fact. *See Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980). An essential element of a bailment is that the original owner retain title to the goods bailed. *See Lionberger v. United States,* 178 Ct.Cl. 151, 167, 371 F.2d 831, 840 (1967). Examination of the terms of several of the asbestos contracts relied upon by Johns-Manville—those with the government-established Metals Reserve Company—reveals a consistent characterization of the transactions as sales, not as bailments. Such language in the contracts governing the trans-

fer of asbestos between the parties indicates that their intent was that title was to pass to Johns-Manville. Johns-Manville neither alleges nor argues any facts showing that the contracts contained any language indicating an intention to create a bailment.

■ Instead, Johns-Manville contends that the pervasive regulatory control that the Government exercised over asbestos, including restrictions on Johns-Manville's use and disposition of asbestos, is sufficient to support an implied-in-fact contract for bailment. Although conduct of the parties can provide useful evidence of the parties' intent, if the words of the written contracts clearly express a contrary intent from the one urged by Johns-Manville—and Johns-Manville points to no other contractual language to support its contention—the court must accept the contract language as conclusive of the parties' intent to create a sale. *See Sturm v. Boker,* 150 U.S. 312, 327, 14 S.Ct. 99, 103, 37 L.Ed. 1093 (1893). Without the bailment on which to premise the alleged warranty of safe use, Johns-Manville's sixth claim must be dismissed.

UNR's claim based on "government-furnished property" is much like Johns-Manville's bailment claim. UNR alleges that the Government's provision of raw asbestos fiber as "government-furnished property" included a warranty by the Government that the product was "free from defects and could be used in a safe manner." Compl. ¶ 70.

■ However, UNR has failed to allege or argue any facts that could demonstrate that its contracts with the Government for asbestos indicated an intent by the parties to transfer "government-furnished property" (a term of art meaning that title to the property would remain with the Government). Rather, the contracts [5] refer to "sales" of asbestos. As with Johns-Manville's claim, UNR's claim must

be dismissed because the factual predicate of "government-furnished property" to UNR's warranty claim is absent.

### 6. *Reformation*

■ Reformation is an equitable remedy which permits a court not to enforce a contract according to its terms if 1) both parties were mistaken about an assumption basic to the making of the contract or about a matter having a material effect on the performance, or 2) the contract as written is not a true reflection of the agreement of the parties. *American Employers Ins. Co. v. United States,* 812 F.2d 700, 705 (Fed.Cir.1987). The Claims Court has jurisdiction to award reformation "as an incident to the rendition of a money judgment." *California-Pacific Util., Inc.,* 194 Ct.Cl. at 715. As a general rule, courts are reluctant to reform contracts that have been performed. *National Presto Indus., Inc. v. United States,* 167 Ct.Cl. 749, 761, 338 F.2d 99, 106–07 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).

■ Johns-Manville alleges that there were two mutual mistakes going to the basis of its contracts with the Government: 1) "that the 5 mppcf measure of exposure to asbestos dust was adequate to protect all workers in Navy and non-Navy shipyards ...;" and 2) "neither knew of a connection between exposure to asbestos dust and mesothelioma." Johns-Manville's Revised Proposed Conclusions of Law, filed Jan. 16, 1987, ¶ 47. Defendant argues that these mistakes do not relate to the basis of the contracts, which had only to do with manufacture and delivery of conforming goods. Moreover, the "mistakes" did not concern facts in existence at the time of contracting, but, rather, disappointed predictions of future events and therefore are not mistakes upon which reformation can be grounded. *See Restatement (Second) of Contracts* ¶ 151 comment a (1981).

---

**5.** The court has examined, properly it believes, contracts between UNR and Metals Reserve Company and UNR and the General Services Administration, which were provided by the Government in the appendix to its reply brief.

Although the contracts were not included by reference, citation, or attachment to UNR's pleadings, the court considers them to be a part of the pleadings based on the requirements of RUSCC 9(h)(4).

Defendant also argues that before reformation can be granted, it must be shown that the party resisting reformation received an extra benefit from the unreformed contract "of the type it contemplated obtaining from the contract," *National Presto Indus., Inc.*, 167 Ct.Cl. at 769, 338 F.2d at 112, so that lack of reformation would be unjust. Defendant contends that it benefitted in no way from the injuries of shipyard workers arguably resulting from these contracts. Johns-Manville responds that it was not the injuries, but the cost savings to defendant, amounting to approximately $100 million growing out of its exclusion of insurance costs from the subject contracts under a policy of self-insurance, that was defendant's benefit.

The issue concerning the parties' assumptions about the level of safe exposure and ignorance about risks of mesothelioma deals with facts existing both at the time of contract formation and future predictions of health consequences. It cannot be characterized as a matter of law. An issue also is present for trial as to whether the Government received the requisite benefit.

■■ Johns-Manville additionally bases its claim for reformation on an alleged mutual intent that "the Government, and not Johns-Manville, would be responsible for injuries arising out of the use of ... asbestos-containing materials...." Compl. ¶ 114. Before this court will reform on the basis of a drafting error, *i.e.*, that the parties agreed on a provision that was left out of the written agreement through mutual oversight, *see Restatement (Second) of Contracts* ¶ 155, such mutual intent as would support an implied contract must be shown. Thus, if it were shown that the parties discussed and rejected a clause indemnifying Johns-Manville, the court would not later imply an agreement to indemnify Johns-Manville's losses. *See California-Pacific Util., Inc.*, 194 Ct.Cl. at 719. Moreover, Johns-Manville cannot reform its contracts to reflect implied-in-fact indemnification provisions to avoid the effect of the ADA. *Id.* at 716. Thus, remaining for trial is only the issue of mutual mistake.

### D. *Breach claims*

1. *Breach of implied warranty that products manufactured according to government specifications produce desired products in satisfactory manner and that products will be safe*

UNR and Eagle-Picher take the position that because the Government developed specifications expressly for asbestos-containing products; supervised their manufacture; and tested them to comply with specifications, including safety, before they left the plant, the Government warranted that the products, as produced, were safe for their intended purposes. Johns-Manville contends that the implied warranty of specifications more narrowly signifies that the products manufactured to customized government specifications will result in satisfactory performance in that the manufacture of the products will not increase the manufacturer's costs of performance.

Government contract law has long recognized that, if a contractor adheres to specifications drafted by the Government, an implied warranty arises in the contractor's favor that a satisfactory and safe product will result. *See United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 670, 609 F.2d 462, 479 (1979); *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 49 (1985), *aff'd*, 790 F.2d 90 (Fed.Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986). Basically, defendant's motions ignored these claims because it was far from clear that Johns-Manville was pursuing its second claim.

■■ UNR and Eagle-Picher state a claim insofar as they may be able to prove that the government specifications intended safe products. *See Travelers Ins. Co. v. United States*, 493 F.2d 881, 888 (3d Cir. 1974). No view is expressed regarding the extent to which the specifications were as customized as alleged, *cf. In re General Dynamics Asbestos Cases*, 539 F.Supp. 1106, 1112 (D.Conn.1982), or whether they were design specifications or in significant

respect performance specifications. *Cf. Lopez v. Johns Manville,* 649 F.Supp. at 156.

██ Johns-Manville, on the other hand, gingerly approaches this warranty claim because it does not really contend that the specifications guaranteed a product that was free from risks of actual or potential health hazards. Johns-Manville implies, but does not state, that it was aware that asbestos-containing products were dangerous or defective, even when produced according to government specifications. Unlike the typical manufacturer in a strict liability situation, however, Johns-Manville alleges that it did not choose to produce a defective product and thereby take on the consequences of liability therefor. Instead, Johns-Manville claims that manufacture of asbestos-containing products was mandated by the Government and that the Government would have prevented Johns-Manville from voluntarily ceasing production. What is described is not an implied warranty of safety of products manufactured according to specifications, because, according to Johns-Manville, neither the Government nor the manufacturer wore blinders as to the dangerous or defective nature of the products. As Johns-Manville frames it, the Government made an implied warranty along the following lines: Manufacturers of dangerous or defective asbestos-containing products are forced to manufacture during the World War II effort, but the Navy will not aggravate the dangers or defects inherent in the products by increasing the cost of contract performance. This formulation of the implied warranty is not a "reverse warranty," based on subsequent use of the product, in any sense of the term, but a warranty based on the parties' shared knowledge of the risks inherent in the production of asbestos-containing products according to government specifications.

The difficulty in allowing trial of UNR's and Eagle-Picher's claims based on the implied warranty of specifications that the products would be safe and Johns-Manville's claim consistent with specifications for a defective product is that the cause of action recognizing implied warranty based on specifications in the Claims Court compensates the contractor for increased costs of performance. UNR makes a spirited argument that increased costs of performance are not restricted to costs of performing the contract. In *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166, for example, a contractor could not complete performance due to defective contract specifications and ultimately was awarded lost profits that would have been realized but for the breach. UNR points also to *Poorvu v. United States,* 190 Ct.Cl. 640, 420 F.2d 993 (1970), for an award of damages for repairing building defects discovered several years after completion of the construction phase of the construction/lease agreement. Defendant argues that no case obligates the Government, after completion of a contract (or frustration of its completion due to a government breach of implied warranty or duty), to satisfy third-party tort liabilities as increased costs of performance. *Lopez v. Johns-Manville* rejected on a motion to dismiss indemnification for tort liability as "manifestly collateral" to contract performance, 649 F.Supp. at 160, but that court does not discuss what facts were alleged on point.

Once again, Johns-Manville supplies the requisite factual nexus by asserting that it did incur increased costs of performance in that reserves were not set aside or insurance coverage was not obtained (which would have been built into the costs of its fixed price contracts), because the Navy agreed to self-insure against claims for third-party liabilities arising out of Johns-Manville's production of asbestos-containing products. Johns-Manville thereby was foreclosed from taking appropriate measures to administer the risks of these contracts.

On a motion for judgment on the pleadings, it cannot be said that a shared understanding of the consequences of performing these government contracts without adequate reserves or insurance did not exist. UNR and Eagle-Picher will have the opportunity to prove the same shared understanding. If they cannot, their claims will

fail, because the third-party liabilities will be collateral to performance.

### 2. *Breach of implied warranty that products would be used safely in the shipyards*

Johns-Manville does not argue that, but for the Government's unsafe use, shipyard workers would not have been exposed to asbestos-related health hazards. Rather, Johns-Manville posits that the Government's failure to enforce its own health standards (which no one seriously contends were adequate at the time, given hindsight analysis) increased the risk of exposure to asbestos and resulted in over-exposing workers who subsequently became diseased and made claims against Johns-Manville. UNR and Eagle-Picher assert a duty to use asbestos-containing products safely because they manufactured safe products, according to the implied warranty flowing from the specifications, and the unsafe subsequent use caused the shipyard workers' injuries.

■ Defendant does not take issue with the general proposition that warranties attach to performance of supply contracts according to government-drafted specifications; instead defendant argues that plaintiffs urge a type of "reverse warranty" of safe use owing by a vendee to a vendor that several courts of appeals and one district court have rejected on motion in asbestos litigation against private shipyards. *Drake v. Raymark Industries, Inc.*, 772 F.2d 1007, 1010 (1st Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986); *White v. Johns-Manville Corp.*, 662 F.2d 243, 248 (4th Cir.1981); *In re General Dynamics Asbestos Cases*, 539 F.Supp. at 1110–11.

Plaintiffs rejoin that none of these cases treated the existence of such a warranty against the Federal Government. However, two federal district courts rejected before trial the same type of claim urged against the Government in cases brought under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2) (1982), for claims under $10,-000. *McMullin v. Keene Corp.*, No. 85–992–Civ–3–16, slip op. at 3 (M.D.Fla. July 30, 1986); *Lopez v. Johns-Manville*, 649 F.Supp. at 160–161. The only trial court ruling that such a claim should be tried dismissed it on the ground that a breach of implied warranty implied the existence of a contract and was thus barred by the ADA, a position this court rejects. *Cooey v. Raybestos-Manhattan, Inc.*, No. PCA 85–4363–RV, slip op. at 7–8 (S.D.Fla. Dec. 5, 1986). The ADA prevents enforcement of contracts; it does not limit redress for breach of an otherwise valid contract.

■ The thrust of these cases, drawing on case law involving suits between private parties, is that a vendor-vendee relationship does not imply a warranty to indemnify the vendor for injuries arising out of use of a defective product. That the Government allegedly drafted customized specifications, mandated performance, tested the products, knew of the defects, supervised the products' use, and failed to enforce its own safety standards have not been viewed as factors that give rise to any duty by the Government, as user of the products, to asbestos manufacturers. Although plaintiffs argue that all these cases were decided wrongly on motion before trial, at issue is the rejection of plaintiffs' claim as a matter of legal liability. This court is not bound by these decisions, but regards them as persuasive, for to recognize this new concept of warranty would incorporate into the law of implied-in-fact contracts the tort doctrine of equitable indemnity and other tort law concepts. To do so, it is submitted, would create what amounts to relief in quasi contract.

■ Products liability law attaches strict liability for defective products. If the manufacturer of a defective product is at fault, strict product liability assigns full responsibility to the manufacturer, even though a vendee or a subsequent user may use the product negligently. Neither the vendee nor user absolve the manufacturer by aggravating the likelihood of injury from a defective product. Equitable indemnity, which is noncontractual (although the parties may have a contract between them) relieves a manufacturer that has

been or could be held strictly liable based on implied fault, but who is without fault (or whose fault is secondary or passive) if the fault of the vendee or user is primary. *See White v. Johns-Manville Corp.,* 662 F.2d at 249; *General Dynamics Asbestos Cases,* 539 F.2d at 1111.

■ Tort law can also predicate liability on a duty based on equitable principles arising out of the parties' conduct. Due to the relationship of the parties (forced sales to the Navy) and their conduct in respect of the subject matter of the contract after contract performance (the Navy assured the manufacturer that it would handle safety matters adequately), one court has found the creation of a duty to indemnify in asbestos litigation brought by a manufacturer against the Government. *Johns-Manville Sales Corp. v. United States,* 622 F.Supp. 443, 449 (N.D.Cal.1985) (order denying motion to dismiss). This court would describe the same scenario as a contract implied in law. *Santisteven v. Dow Chemical Co.,* 506 F.2d 1216, 1219 (9th Cir.1974).

■ Moreover, plaintiffs point to no case from the law on contractual indemnity that stands for the proposition that a breach claim can be based on an implied warranty running to the manufacturer that the purchaser or user of a product will use it in a safe manner. *Travelers Ins. Co. v. United States,* 493 F.2d at 888, upheld a cause of action for indemnity against the Government after collapse of a tower designed by the Government. It was alleged that the Government was "exclusively responsible for the design, assembly, inspection, possession, and control of the tower." *Id.* at 883. The gravamen of the complaint was that the unsafe design and lack of safety measures caused the accident. The case is distinguishable because government use of the tower, or even government conduct post-construction, was not in issue. Defects in what the Government designed were the basis of the claim recognized by the Third Circuit, rather than an alleged warranty that the tower would be used by the Government in a safe manner. The case is not transmutable to a warranty that the product would be used in a safe manner, as opposed to function safely as intended. *See Proctor & Schwartz, Inc. v. United States Equip. Co.,* 624 F.2d 771, 774 (6th Cir.1980) (contract provided that vendee would furnish and install safety devices); *Weggen v. Elwell-Parker Elec. Co.,* 510 F.Supp. 252, 254 (S.D.Iowa 1981) (purchaser's input into specifications and design modifications in purchase order contract "may be so instrusive, specialized and specific that it gives rise to an independent duty requiring the purchaser to use due care in the design and specification of component parts"); *Roy v. Star Chopper Co.,* 442 F.Supp. 1010, 1020 (D.R.I.1977), *aff'd,* 584 F.2d 1124 (1st Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979) (vendee undertook sole responsibility for design and assembly of machine, as well as addition of safety devices).

Only *Roy v. Star Chopper* involved the implication of a warranty from the parties' conduct in respect of their obligations under an express contract. The express contracts in the other cases created obligations tantamount to design warranties. Although this court disagrees with the conclusion in *Roy v. Star Chopper* that "the peculiar nature of the transaction for sale of the machinery in question," 442 F.Supp. at 1013, gave rise to an implied-in-fact contract to indemnify, as opposed to a breach of warranty of safe design and assembly, the point to be made is that *Roy v. Star Chopper* is not a case involving use of the product. *Vickery v. Reliable Elec. Co.,* 703 F.2d 488, 491 (10th Cir.1983); *Turnbull v. Andrew Crowe & Sons, Inc.,* 572 F.Supp. 1254, 1257 (W.D.Mich.1983); and *Die Cutter Repair Service, Inc. v. King Seeley Thermos Co.,* 543 F.Supp. 250, 253 (E.D.Mich.1982), cited by Johns-Manville, find either no contractual relationship or merely restate the principle of contractual indemnity based on implied warranty of freedom from defects or safety.[6]

---

**6.** Conceivably, a contract could specify the obligations of a purchaser with respect to installation and removal of asbestos products such that the basis for a breach of duty could be stated or a warranty could be implied, but plaintiffs in the cases at bar do not so allege or argue.

### 3. Breach of duty to disclose superior knowledge

█ Plaintiffs allege that the Government failed to disclose to them either its superior knowledge of 1) the health hazards incident to manufacture and use of asbestos-containing products and 2) the failure to enforce government safety standards in government and contract shipyards. The doctrine of superior knowledge took root in *Helene Curtis Industries, Inc. v. United States*, 160 Ct.Cl. 437, 444, 312 F.2d 774, 778 (1963), and imposes on the Government a duty to disclose its superior knowledge concerning factors that may affect the cost or duration of contract performance. *See American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 225, 654 F.2d 75, 79 (1981). Johns-Manville had some knowledge, and UNR and Eagle-Picher take the position that they knew nothing about the dangers of asbestos. Whether plaintiffs had qualitative or quantitative knowledge concerning the actual or potential hazards of asbestos-containing products, or whether they had reason to obtain knowledge, and whether plaintiffs' knowledge relieved the Government from an obligation to reveal its superior knowledge cannot be decided on motions for judgment on the pleadings. Thus, the issues whether plaintiffs had no knowledge or reason to obtain knowledge and whether the Government had "superior" knowledge must be tried.

Plaintiffs argue that the Government knew and withheld information that would have presaged liability and that this information was crucial to the costs they would have included in their price structures. This is not to say that any plaintiff has stated a claim to a "reverse warranty." Regarding the duty to disclose superior knowledge, it is ruled only that all three plaintiffs state a claim that they would have altered their price structure (cost of performance) if they knew what the Government did about the risks of asbestos. If the Government's knowledge is proved not to be "superior," *i.e.*, if plaintiffs cannot prove that the Government knew more than they did about the actual or potential hazards of asbestos, they will

not prevail. Similarly, if defendant establishes that plaintiffs as manufacturers were presumptively knowledgeable, plaintiffs will not prevail.

### 4. Breach of duty of cooperation

In response to defendant's motion for judgment on the pleadings, Johns-Manville argues that the duty of cooperation has been breached. This duty was described in *Volentine & Littleton v. United States*, 144 Ct.Cl. 723, 726, 169 F.Supp. 263, 265 (1959), as obligating the Government not to impede the performance of a government contractor. Defendant argues that somehow Johns-Manville's affirmative duty to seek information on hazards associated with shipyard use of its asbestos products relieves the Government of its corresponding obligation, as framed by Johns-Manville, to disclose hazards (including its own failure to follow safety standards) that would have enabled the contractor to perform successfully. Once again, Johns-Manville's version of facts is accepted as true. The court, however, views a claim based on the duty to cooperate as redundant of Johns-Manville's claim based on the duty to disclose superior knowledge.

### 5. Breach of express warranty

█ Johns-Manville claims that the Government expressly warranted that asbestos-containing products would be used under safe conditions in shipyards during World War II. The basis of this warranty is the Government's publication of health and safety standards for private shipyards and public representations about health and safety programs at shipyards. As the Government argues, this is a claim that appears only in *Paccon, Inc. v. United States*, 185 Ct.Cl. 24, 37–38, 399 F.2d 162, 170 (1968), and predicates government liability on misrepresentation. The allegations in Johns-Manville's complaint, as supplemented by its pretrial materials, show that any such government representations would have been material, especially because Johns-Manville alleges that it was required to perform contracts for the manufacture of asbestos-containing products

for the Government. However, Johns-Manville does not allege that it was aware of the statements or relied on them. At this point in the proceedings, plaintiffs must be prepared to describe with some particularity the facts forming the express warranty that will be accepted as true. Johns-Manville has described in detail oral representations of key Navy contract personnel concerning an alleged commitment to indemnify Johns-Manville for liabilities to third parties arising out of catastrophic hazards. If Johns-Manville were to prove that the public statements synoposized or quoted in its proposed factual findings lulled it into believing that the Government was not doing anything to aggravate a potential liability situation that would increase its performance costs, the public statements are evidence for its claims based on breach of implied warranty in specifying unsafe products not to aggravate Johns-Manville's exposure to risks or breach of the duty to disclose superior knowledge. Taken separately, however, the allegations cannot be the basis for a breach of express warranty absent the allegation that Johns-Manville took some action, or declined to act, in reliance upon these representations.

### 6. *Privity*

Defendant also seeks to dismiss a portion of Johns-Manville's breach of warranty and breach of duty claims on the ground that Johns-Manville lacked the privity necessary to support those claims involving sales contracts to parties other than the Government. By construing all of the contracts under which Johns-Manville may have sold asbestos products to parties other than the Government for use in the shipyards as contracts between a subcontractor and a prime contractor, defendant attempts to undercut Johns-Manville's ability to meet the necessary predicate for breach of contract claims under the Tucker Act that the party be in a direct contractual relationship with the Government. *See Merritt v. United States*, 267 U.S. 338, 340, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925).

■ Defendant does not challenge Johns-Manville's privity with the Government as to contracts that Johns-Manville alleges were made to sell asbestos products directly to the Government. As to contracts that involved sales to a party other than the Government, Johns-Manville contends that the Government's involvement in the contracts in various ways, including allowing other parties such as shipyards to act as its agents, satisfies any privity requirement. Assertions of fact, such as the agency of Johns-Manville's contractual partners, that may be sufficient to establish privity if proved, *see, e.g., Johnson Controls, Inc. v. United States*, 8 Cl.Ct. at 367–69, prevent the Government from prevailing on this defense on a motion for judgment on the pleadings. The Government ultimately may prevail, since privity alignments on the sales contracts affect the nature and direction of duties and warranties owed under the contracts. *See In re All Asbestos Cases*, 603 F.Supp. at 611; *In re All Maine Asbestos Cases*, 581 F.Supp. 963, 973 (D.Me.1984), *aff'd*, 772 F.2d 1023 (1st Cir.1985). However, the resolution of this issue must await trial. Since UNR makes the same agency allegations, the Government's motion to dismiss breach claims for lack of privity must be denied as to UNR and Eagle-Picher, as well.

### E. *Claim for equitable adjustment*

■ Johns-Manville also claims entitlement to recover its increased costs growing out of asbestos-related injuries based on equitable adjustment. Equitable adjustment is available to compensate a contractor for increased costs of performance flowing from changes that alter the work to be performed under the contract, *J.W. Bateson, Inc. v. United States*, 226 Ct.Cl. 527, 528, 650 F.2d 291 (1980); *Bruce Construction Corp. v. United States*, 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963). The claim is based on two alleged changes to contract terms made by defendant that resulted in increased costs of performance to Johns-Manville: the Government's failure to enforce its shipyard asbestos safety standards and to disclose the hazardous conditions under which asbestos-containing products were being used in the shipyards.

The Claims Court has required that plaintiff meet a high standard before a contract will be equitably adjusted: Increased costs must arise from "conditions differing materially from those indicated in the bid documents," and such conditions "must also be reasonably unforeseeable on the basis of all the information available to the contractor," *Mojave Enterprises v. United States*, 3 Cl.Ct. 353, 357 (1983); plaintiff must show that costs actually increased because of changes in requirements, *Wieman v. United States*, 230 Ct.Cl. 563, 573, 678 F.2d 207, 214 (1982); and plaintiff must show that the increased costs were the direct and necessary result of the change. *Paul Hardeman, Inc. v. United States*, 186 Ct.Cl. 743, 752, 406 F.2d 1357, 1369 (1969) (Davis, J., concurring).

 The court has rejected the claim that the Government owed Johns-Manville a duty to enforce safety standards in government and contract shipyards. However, the claim for an equitable adjustment is viable in respect of the Government's alleged obligation to inform Johns-Manville of unique knowledge that the Government had reason to understand was material to Johns-Manville's performance. Because the Government did not change Johns-Manville's contract performance, but failed to disclose superior knowledge bearing on the performance, the claim probably will be held after trial not to seek an equitable adjustment.

### F. *Claim for fifth amendment taking*

 Johns-Manville asserts that the Government's actions or failures to act have caused Johns-Manville to assume the costs of compensating victims of asbestos-related diseases which has resulted in a taking of Johns-Manville's property without just compensation. Johns-Manville makes this claim in the alternative: "Manville simply asserts that if the Court should find that no valid wartime contracts existed, then a government taking of Manville's property, compensable under the Fifth Amendment, should be found." Johns-Manville's Br. filed Jan. 9, 1987, at 88. Defendant's first response to this claim is that, since neither party is contending that no valid contracts were in existence, Johns-Manville's alternative taking claim cannot stand. Johns-Manville had valid supply contracts. That Johns-Manville may not be able to prove a breach of those contracts does not constitute a taking, even if the consequence of Johns-Manville's failure of proof is that it has been required to pay out unreimbursed judgments, settlements, and litigation expenses. However, Johns-Manville's alternative theories do not displace its taking claims in that Johns-Manville argues that government conduct unrelated to its supply contracts amounted to a taking.

 The Supreme Court has not established a clear rule as to when a government exercise of dominion resulting in economic injury rises to the level requiring compensation for a taking, but rather has established three factors to be used in examining particular circumstances: 1) "[t]he economic impact of the ... [government action] on the claimant"; 2) "the extent to which the ... [action] has interfered with distinct investment-backed expectations;" and 3) "the character of the governmental action." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The Court in *Penn Central* amplified the third factor by adding that a taking is more likely to be found where "the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124, 98 S.Ct. at 2659 (citation omitted). When the claimed taking results from policy-related economic regulation, the result must be a major interference with ownership rights, not simply a use of plaintiff's property. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). *See generally Morton Thiokol, Inc. v. United States*, 4 Cl.Ct. 625, 630–31 (1984). Although the usual case involves real property, an interference with contract rights also may be found to be a taking. *See, e.g., Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed.Cir.1983). The standards

for finding a compensable taking remain as high: A permanent deprivation of an entire right must be found. *Todd v. United States,* 155 Ct.Cl. 87, 94–95, 292 F.2d 841 (1961).

■■■■ Before a court will find a compensable taking, it must additionally be satisfied that 1) plaintiff's loss was directly and proximately caused by governmental action, *Rhoads v. United States,* 6 Cl.Ct. 278, 279–80 (1984), *aff'd mem.,* 770 F.2d 182 (Fed.Cir.1985); and 2) plaintiff's loss was an "intended incident of the taking," *Mitchell v. United States,* 267 U.S. 341, 345, 45 S.Ct. 293, 294, 69 L.Ed. 644 (1924). Johns-Manville must prove the Government's intent to take its property, or that there was "an intention to do an act the natural consequence of which was to take its property." *Baird v. United States,* 5 Cl.Ct. 324, 329 (1984) (quoting *Columbia Basin Orchards v. United States,* 132 Ct.Cl. 445, 450, 132 F.Supp. 707 (1955)). Absent such intent, the taking is tortious, and the Claims Court cannot exercise jurisdiction over the claim. *Berenholz v. United States,* 1 Cl.Ct. 620, 626 (1982), *aff'd mem.,* 723 F.2d 68 (Fed.Cir.1983).

■■■■ Johns-Manville's pleadings are unclear as to what governmental action is alleged to constitute a taking. There are, apparently, two government "actions and failures to act that compelled Johns-Manville to assume the risks for such compensation [of injured shipyard workers which] constituted a compensable taking under the fifth amendment," Johns-Manville's Revised Proposed Conclusions of Law, filed Jan. 16, 1987, No. 59: 1) the Government's failure to enforce health and safety standards and consequent exposure of shipyard workers to asbestos during World War II, Johns-Manville's Memorandum in Support of Proposed Findings of Fact, filed Nov. 24, 1986, at 93; and 2) the Government's decision in 1982 "that it would no longer make monetary settlements of any kind in any asbestos-related litigation, ... but would litigate every such case 'to the nth degree.'" *Id.* at 44.

If the failure to enforce safety standards is the Governmental act resulting in the taking of Johns-Manville's property, the statute of limitations poses a bar since that lack of enforcement occurred, if at all, 40 years ago. Even if this difficulty could be overcome by the tolling of the statute until the actual value of the taking can be determined, *Silverberg v. United States,* 155 Ct.Cl. 436, 439–40 (1961), any such failure does not rise to the level of a compensable taking.

Although the alleged failure to enforce safety standards arguably had an indirect impact on Johns-Manville that interfered with investment-backed expectations, the character of that governmental action is that of an economic regulation of general effect, rather than an invasion of an individual's property. Relaxation of safety requirements in shipyards would have followed a policy decision that resultant risks were outweighed by concomitant economies. Thus, under *Penn Central,* any economic injury allegedly flowing from this governmental action would be less likely to be found to be a compensable taking.

Since injuries suffered by shipyard workers may have been the direct result of the governmental action of not enforcing safety standards, defendant argues that losses sued for here by Johns-Manville are not the direct result of lack of enforcement, but, instead, of decisions by Johns-Manville to settle claims or of courts to award judgments—events entirely independent of any governmental action. The court agrees. The Claims Court consistently has held that before a compensable taking will be found, a plaintiff's loss must be "proximate[ly] and direct[ly] cause[d] by the government's action." *Rhoads v. United States,* 6 Cl.Ct. at 279 (citing cases); *Columbia Basin Orchard v. United States,* 132 Ct.Cl. 445, 450, 132 F.Supp. 707 (1955). There are simply too many intervening events and decisions between the alleged act of taking and Johns-Manville's economic losses to constitute a direct and proximate causal link.

■■■■ It cannot be said, and Johns-Manville has not alleged, that the Government had actual intent to take Johns-Manville's property. Johns-Manville correctly contends that intent to appropriate private property for public use may be implied from the facts, *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 769, 572 F.2d 786,

818 (1978), where "the nature and probable consequences of [a governmental act would] effect ... an enduring invasion of plaintiff's property." *Barnes v. United States,* 210 Ct.Cl. 467, 476, 538 F.2d 865 (1976). As interpreted by the Claims Court, the foreseeability of damage resulting from the governmental act determines whether the requisite intent to take exists. *Baird v. United States,* 5 Cl.Ct. at 330. However, Johns-Manville has alleged no facts that tend to show that either party foresaw that 30–40 years after World War II courts would find Johns-Manville liable for injuries to shipyard workers or that it would settle such claims. (This does not undercut the notion that the parties contemplated that third-party liabilities could increase costs of contract performance.) Thus, since Johns-Manville's losses from these events were not the natural and probable consequence of any governmental action, no intent to take Johns-Manville's property could be found.

If, on the other hand, the governmental action allegedly resulting in a taking of Johns-Manville's property was the 1982 decision to cease settling claims for asbestos-related injuries, Johns-Manville fares little better.[7] The character of the Government's action under the *Penn Central* standard is even more clear here. The only reasonable basis for the decision to defend these cases is that it would be a more fiscally responsible position for the Government to take. If a private economic loss results, it is less likely to be a compensable taking since it is the product of a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.

The requirements that the economic loss be caused directly and intentionally by governmental action are not met here, either, since the source of Johns-Manville's losses (settlements and judgments) is the same regardless of which action allegedly caused the taking. Because the intervening and independent decisions by courts to hold Johns-Manville responsible for paying judg-

ments, and of Johns-Manville itself to make settlements, the "natural and probable consequence" link is broken just as completely as if the alleged taking were caused by failure to enforce safety standards.

■ Defendant argues that Johns-Manville may not maintain a fifth amendment claim for compensation where the same subject matter is covered by a valid contract. As Johns-Manville points out, however, all the cases defendant cites to support this proposition indicate that a supplier, having once agreed to a price term, whether willingly or under threat of compulsion, is bound by that price; if the price is left open, the supplier is due the fair market value. *See, e.g., Honolulu Rapid Transit Co. v. Dolim,* 459 F.2d 551, 553 (9th Cir.1972); *Federal Sugar Refg. Co. v. United States,* 60 Ct.Cl. 184, 200–01 (1925). In contrast, if the contractor has been compelled to enter a contract a taking will be found, and just compensation is a fair price for the goods. *Liggett & Myers Tobacco Co. v. United States,* 274 U.S. 215, 220, 47 S.Ct. 581, 582, 71 L.Ed. 1006 (1927).

The issue raised by Johns-Manville is not whether it received a fair price for products supplied, but whether costs to Johns-Manville from subsequently discovered injuries arguably resulting from use of those products constitute a compensable taking of its property. Since the action of the Government that allegedly resulted in a taking—whether it be the decision not to enforce safety standards in World War II shipyards or the decision to cease paying damage claims for asbestos-related injuries—was in the nature of an economic regulation, Johns-Manville has a more difficult burden to carry in proving a compensable taking. The burden has not been met since no facts, alleged or provable, describe a taking as the intended or direct result of governmental action.

## CONCLUSION

Defendant's motions for judgment on the pleadings are granted insofar as the complaints will be dismissed as to claims for express and implied-in-fact contract, refor-

---

**7.** Any impediment posed by the statute of limitations, however, would be eliminated, as Johns-

Manville's complaint was filed in 1983.

mation, and warranty of safe use in the shipyards. The claims relating to bailment or government-furnished material, misrepresentation, and taking also will be dismissed. Based on the foregoing,

IT IS ORDERED, as follows:

1. Defendant's motion for judgment on the pleadings is granted in part as to *Johns-Manville Corp.*, No. 465–83C, and the complaint is dismissed as to claims 1, 3, 4, 6, 7, 9, and 10 (as to reformation to create implied-in-fact contracts).

2. Defendant's motion is granted in part as to *UNR Industries, Inc., et al.*, No. 16–84C, and the complaint is dismissed as to claims 1 (as to contracts express or implied in fact), 3, and 4.

3. Defendant's motion is granted in part as to *Eagle-Picher Industries, Inc.*, No. 170–83C, and the complaint is dismissed as to claim 2.

4. Defendant's motion is otherwise denied.[8]

---

8. The court does not rule on the sovereign acts defense at this time.